# PHILADELPHIA ELECTRIC COMPANY

v.

# HERCULES, INC. and Gould, Inc.

## Appeal of HERCULES, INC.

### No. 84–1159.

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1984.

Decided May 28, 1985.

As Amended June 18, 1985.

Rehearing and Rehearing In Banc Denied June 21, 1985.

John Gerald Gleeson (Argued), Wilmington, Del., Joseph G. Manta, John C. Sullivan, Frumkin & Manta, Philadelphia, Pa., for Hercules, Inc.

Joseph M. Donley (Argued), Robert Emmet Hernan, Kittredge, Kauffman & Donley, Philadelphia, Pa., for Philadelphia Elec. Co.

Kean K. McDonald, LaBrum & Doak, Philadelphia, Pa., for Gould, Inc.

Before GARTH and HIGGINBOTHAM, Circuit Judges, and McCUNE, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This is an appeal from a final judgment of the district court in favor of Philadelphia Electric Company ("PECO") and against Hercules, Inc. ("Hercules") in the amount of $394,910.14, and further ordering Hercules to take all appropriate action to eliminate pollution on a property owned by PECO in Chester, Pennsylvania. The case was tried to a jury on theories of public and private nuisance. For the reasons set forth in the opinion that follows, we will reverse the judgment against Hercules on PECO's claims, and vacate the injunction.

### I.

Prior to October of 1971, the Pennsylvania Industrial Chemical Corporation ("PICCO") owned a tract of land abutting the Delaware River in Chester, Pennsylvania where it operated a hydrocarbon resin manufacturing plant. At the time PICCO acquired the property ("the Chester site") there was an inlet located at the southern end that opened into the Delaware River. Sometime later PICCO filled in the shoreline at the inlet and thereby created a lake ("the PICCO pond"). During the period it conducted operations on the Chester site, the evidence tended to show, PICCO deposited or buried various resins and their by-products in the PICCO pond and possibly other locations.

In 1971 PICCO ceased operations on the Chester site and sold the facility to Gould, Inc. ("Gould"). Gould did not conduct any operations on the Chester site, other than leasing certain tanks to ABM Disposal Services Company ("ABM"), which used them to store large quantities of various waste materials, though apparently not resins or resinous by-products.

In mid-1973, PECO—which operated a plant on an adjoining piece of land—obtained an option to purchase the Chester site from Gould. Prior to exercising its option, a PECO representative inspected the site on more than one occasion, including walking tours along the banks of the Delaware River and the banks of the PICCO pond. PECO learned that Gould's tenant, ABM, had caused a number of spills on the site, including oil spills in the pond area, and was informed that ABM was a "sloppy tenant". ABM was unable to clean up the Chester site in time to meet Gould's original deadline for vacating the premises, a condition of the PECO purchase agreement. PECO exercised its option and ac-

---

* Honorable Barron P. McCune, United States District Court for the Western District of Pennsylvania, sitting by designation.

quired the property in March of 1974. PECO has conducted no operations on the Chester site, but has leased a portion of the land to American Refining Group, Inc.

In 1980 the Pennsylvania Department of Environmental Resources ("DER") discovered that resinous materials similar to those once produced by PICCO were seeping from the banks of the Delaware River at the Chester site, and that the PICCO pond was contaminated with the same material. On August 22, 1980 PECO received the following letter from a DER Water Quality Specialist:

This is to confirm the results of an inspection conducted on July 15, 1980 ... which revealed that a resinous material was leaching from the bank of the Delaware River from PECO property located between Jeffrey and Ward Streets. Such condition is in violation of Title 25, Chapter 101, Section 2 of the Rules and Regulations of the Department of Environmental Resources regarding Special Water Pollution Regulations.[1]

During our preliminary survey of the site you stated that the property was once owned by Pennsylvania Industrial Chemical Company which operated a resin disposal lagoon on site. You mentioned that core samples had been taken of this site, that the contents of the lagoon had been pumped to a storage tank and samples of this material were being analyzed. In order that we may evaluate the impact of this material on the Delaware River we request that a copy of the core sampling results and a copy of chemical analysis of the substance be submitted to the Department. If the core sampling does not provide sufficient data, additional monitoring may be required.

It was also noted that a remnant of the resin lagoon remains on site. During our inspection you indicated that this lagoon was going to be cleaned out and abandoned. Please indicate how and when this work will be accomplished.

In response, PECO developed a plan whereby the remaining pond resin would be removed to a landfill, and the PICCO pond area would be backfilled and regraded. DER approved this plan on November 21, 1980. PECO produced evidence indicating that it incurred expenses of $338,328.69 in implementing the clean-up, and an additional $7,578 in collecting and carting away resinous material that continued to leach to the surface at various places around the Chester site during the summers of 1981–1983. PECO also introduced evidence of $67,500 in lost rentals from American Refining due to the continuing leaching.

In a letter dated March 10, 1981, DER expressed satisfaction with the clean-up of the pond area, but reported that a February 27, 1981 inspection revealed resins still on the Delaware River bank and continued leaching of resins into the River. PECO was asked to "submit in writing ... Philadelphia Electric's position on the control or clean-up of the resin material remaining on the bank." After PECO expressed reluctance to spend any additional money on clean-up of the Chester site, DER wrote PECO again, on May 28, 1981:

Leachate analysis of the resin on the river bank indicates that there is a leaching problem from the resin. Such discharge constitutes an unpermitted discharge to the waters of the Commonwealth and is a violation of the Clean Streams Law, subject to the penalties provided therein. It is therefore required that the resin material on the river bank be removed.

The record does not reveal that DER or PECO has taken any further action regarding the resinous material on the river bank, and PECO's witness testified at trial that the condition still existed.

On February 16, 1982, PECO instituted suit against Gould and Hercules, which had acquired the remaining assets of PICCO in 1973, in exchange for Hercules stock. (PICCO was dissolved on January 9, 1976.) Hercules cross-claimed against Gould. On

---

**1.** These are regulations promulgated pursuant to authority granted by the Pennsylvania Clean Streams Law. 35 Pa.Stat.Ann. § 691.5 (Purdon Supp.1983).

cross-motions for summary judgment the district court ruled that Hercules was liable as PICCO's corporate successor under the express terms of the Agreement and Plan of Reorganization ("the Agreement") it entered into with PICCO, and because the transaction was a *de facto* merger. A jury trial was held in July of 1983. PECO, stating that discovery had shown no wrongdoing on the part of Gould, offered no evidence against Gould.[2] At trial Hercules attempted to show that the pollution was not consistent with PICCO's operations on the Chester site, but was consistent with the operations of ABM and other industrial plants in the area. At the close of evidence, the jury was instructed on principles of public and private nuisance. The jury's verdict was rendered in the form of answers to special interrogatories:

1. Do you find by a preponderance of the evidence that PICCO caused the contamination of the property now owned by Philadelphia Electric Company? YES.

2. Do you find by a preponderance of the evidence that the contamination on the property now owned by Philadelphia Electric Company continues to pollute the groundwater or the Delaware River? YES.

3. In what amount do you award damages? $345,906.69.

4. Do you find by a preponderance of the evidence that ABM's activities contributed to the contamination of the Philadelphia Electric Company property? YES.

5. Was Gould aware of ABM's activities and permitted them to continue? NO.

Based on these answers, the district court moulded a verdict and entered judgment for PECO against Hercules in the amount of $394,910.14, which included delay damages of $49,003.45 pursuant to Pennsylvania Rule of Civil Procedure 238, entered judgment for Gould on Hercules'

cross-claim, and issued an injunction as follows:

IT IS FURTHER ORDERED and DECREED that Hercules, Inc. shall forthwith take all appropriate action to abate and eliminate the contamination on the property of the Philadelphia Electric Company located at the Chester site and abate the further pollution of the groundwater and the Delaware River adjacent to the property by collecting and removing all pollutants in accordance with all applicable rules and regulations of the Pennsylvania Department of Environmental Resources, the United States Environmental Protection Agency, and any other appropriate state or federal regulatory agency.

In this appeal Hercules contends, *inter alia*, that the district court erred in ruling that it was liable as PICCO's successor, and that PECO had no cause of action against it for public or private nuisance. The parties are agreed that the substantive law of Pennsylvania governs this diversity case.

## II.

■ "As a general rule," under Pennsylvania common law, "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *McClinton v. Rockford Punch Press & Manufacturing Company*, 549 F.Supp. 835, 837 (E.D.Pa.1982). Four exceptions to the general rule of nonliability are widely recognized, in Pennsylvania and elsewhere. Thus, where (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability, a successor corporation may be

---

**2.** After trial PECO revealed that it had actually released Gould from liability in consideration of $5,000. Though we do not approve of this lack

of candor, we do not believe that Hercules was prejudiced or that reversal is required on this ground.

held responsible for the debts and liabilities of its predecessor. *See Shane v. Hobam, Inc.,* 332 F.Supp. 526 (E.D.Pa.1971); *Granthum v. Textile Machine Works,* 230 Pa.Super. 199, 326 A.2d 449 (1974). *See generally* 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 (rev. perm. ed. 1983). "A fifth circumstance, sometimes included as an exception to the general rule, is where the transfer was without adequate consideration and provisions were not made for creditors of the transferor." *Husak v. Berkel, Inc.,* 234 Pa.Super. 452, 457, 341 A.2d 174, 176 (1975). In addition, Pennsylvania has recently adopted the more controversial "product-line" exception in products liability cases. *See Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981); *Savini v. Kent Machine Works,* 525 F.Supp. 711 (E.D.Pa.1981). *See generally* Comment, *Expanding the Products Liability of Successor Corporations,* 27 Hast.L. J. 1305 (1976). In the instant case the district court found, as a matter of law, that Hercules had expressly assumed PIC-CO's liabilities and that the transaction amounted to a *de facto* merger. We agree with the district court as to both theories of successor liability.

## A. *Express Assumption of Liability*

■ Article IV, paragraph 4.1(iii) of the Agreement provided for:

> [t]he assumption by Hercules of all the debts, obligations and liabilities of Picco as of the Closing Date, excepting therefrom the liabilities arising out of the breach of any warranty of Picco contained herein, in any certificate or other instrument furnished hereunder, any misrepresentation by Picco herein, or the failure of Picco to perform under any of its agreements and contracts herein, and except liabilities of Picco set forth in subsection (iv) for which cash is specifically reserved herein.

As the district court noted, under this language Hercules broadly assumed *all* liabilities incurred by Picco as of the closing date, subject to a few limited exceptions. In such cases, it is of no consequence that the specific liability at issue is not enumerated. *See Bouton v. Litton Industries,* 423 F.2d 643 (3d Cir.1970); *Bippus v. Norton Company,* 437 F.Supp. 104 (E.D.Pa. 1977). Unless this liability comes within one of the express exceptions, Hercules may be held to have assumed it.

■ Hercules seeks to avoid this result by juxtaposing the exception for "liabilities arising out of the breach of any warranty of Picco" with Picco's warranty, in article I, paragraph 1.4 of the Agreement, that "at the date hereof Picco has no material liabilities, contingent or otherwise, not reflected in the Picco Balance Sheet, not otherwise herein disclosed, and all such financial statements have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved." Hercules contends that in light of this warranty, it is apparent that it did not assume liabilities, such as the one at issue, that were contingent or unknown at the closing date. We find this contention unpersuasive. As we read the exception for liabilities arising out of breach of warranty by PICCO, it would seem to preserve the rights of Hercules as against PICCO in the event of a breach; it does not pertain to the rights of injured third parties.[3] Moreover, we doubt that there is a breach of the warranty here. Because, as Hercules concedes, the liability was unknown as of the date of the Agreement, PICCO could not have been responsible for disclosing it. *Cf. Bouton v. Litton Industries,* 423 F.2d at 652.

Our conclusion that Hercules' assumption of liability did not exclude liabilities that were unknown or contingent is bolstered by a comparison of the language employed here with that used in cases where such liabilities were deemed to be

---

**3.** *See Carlin v. Pennsylvania Power and Light Co.,* 363 Pa. 543, 545, 70 A.2d 349, 351 (1950) ("The cause of action owned by the plaintiff is distinct from the cause of action arising out of the duty of the additional defendant to indemnify the defendant.").

excluded. In *Lopata v. Bemis Company*, 383 F.Supp. 342 (E.D.Pa.1974), *vacated*, 517 F.2d 1398 (3d Cir.), *judgment reinstated*, 406 F.Supp. 521 (1975), *aff'd*, 546 F.2d 417 (1976), the agreement at issue provided that the purchaser of the assets "shall not assume any liabilities of the seller nor take the assets subject to any liabilities whether fixed or contingent, known or unknown," except as specifically provided. *Id.* at 344. In *McCullough v. National Bank of Union City*, 127 Pa.Super. 452, 193 A. 65 (1937), the defendant bank purchased the assets of a closed bank and assumed responsibility for 60% of its "known, existing liabilities." In *Travis v. Harris Corp.*, 565 F.2d 443 (7th Cir.1977) the purchaser assumed "all debts, obligations, contracts and liabilities of [the transferor] of any kind, character or description, whether accrued, absolute, contingent or otherwise, as reflected on the balance sheets, books of account and other records of [the transferor] on the date hereof." 565 F.2d at 446. This language was deemed to exclude unknown liabilities. In light of the clear and specific language that has been used to effect the exclusion of unknown or contingent liabilities in other cases, we must decline to follow Hercules' rather strained interpretation of the Agreement at issue. We conclude that Hercules has assumed any liability PICCO may have had due to pollution of the Chester site.

**B. *De Facto Merger***

Judge McGlynn's excellent discussion of this theory of successor liability is worth setting out in full:

As previously noted, the Hercules-PICCO agreement was entitled an Agreement and Plan of Reorganization. However, because of the complex nature of corporate reorganizations and acquisitions the intrinsic nature of a transaction cannot be ascertained merely from the form by which it is structured. It is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent. *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir.1974) (Rosenn, J., concurring), *cert. denied* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975).

In determining whether a particular transaction amounts to a de facto merger as distinguished from an ordinary purchase and sale of assets most courts look to the following factors:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*See e.g., Shannon v. Samuel Langston Company*, 379 F.Supp. 797, 801 (W.D. Mich.1974); *McKee v. Harris Seybold Co., Div. of Harris-Int. Corp.*, 109 N.J. Super. 555, 264 A.2d 98, 103–105 [ (Law Div. 1970) ], *aff'd*, 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972); *See also Knapp*, 506 F.2d at 365.

In *Knapp*, the plaintiff was injured in 1969 when his hand was caught in a machine that had been designed and manufactured by Textile Machine Works, (TMW) and sold to plaintiff's employer in 1966 or 1967. 506 F.2d at [362]. In April of 1968, eighteen months prior to plaintiff's injuries, TMW entered into an agreement with North American Rockwell Corp., (Rockwell) whereby Rockwell acquired substantially all of the assets and liabilities of TMW in exchange for Rockwell stock. The agreement also stipulated that TMW was to dissolve as

soon as possible. *Id.* at 363. Knapp brought his action against Rockwell in 1971 alleging his injuries resulted from the negligence of TMW in designing and manufacturing the machine and that Rockwell, as TMW's successor, was liable for such injuries. The transaction between TMW and Rockwell was characterized as a sale of assets. *Id.* at [362–63].

In reversing the district court's award of summary judgment in favor of Rockwell, the Court of Appeals held that, for the purposes of determining liability for tortiously injured parties, the Rockwell-TMW transaction should be treated as a de facto merger thereby subjecting Rockwell to liability for injuries caused by defective products distributed by TMW prior to the transaction. *Id.* at 367.

While cognizant of the general rule of nonliability for a corporation which merely purchases another's assets, the *Knapp* court nevertheless looked beyond the form of the transaction. In doing so the court enumerated several factors as indicia of a de facto merger: the exchange of substantially all of TMW's assets and liabilities for Rockwell stock; the nominal amount of cash which Rockwell left with TMW to cover the expenses of the transfer with the proviso that any funds remaining after dissolution was [sic] to be returned to Rockwell; and finally, the requirement that TMW was to distribute the Rockwell stock to its shareholders and dissolve as soon as practicable. *Id.* at 363.

The factors which the *Knapp* court focused on in imposing liability on the successor corporation are likewise present here. The Hercules-PICCO agreement provided that Hercules was to acquire all the assets and substantially all of the liabilities of PICCO in exchange for Hercules stock; PICCO was to use its best efforts to keep its business organization intact, to keep available to Hercules the service of its present employees and to maintain its relationship with its customers and suppliers for Hercules' benefit; PICCO's management and

personnel became a part of Hercules; PICCO was required, to the extent permitted by law, to transfer to Hercules the right to use its corporate name; PICCO was left with a nominal amount of money to dispose of its expenses in connection with the transaction and any money remaining was to be returned to Hercules; PICCO was required to dissolve as soon as practicable; and finally, following closing, Hercules continued to operate the PICCO plants, produce the same PICCO products and represented to PICCO's customers that PICCO resins had became a part of Hercules' Organics Department.

*Philadelphia Electric Co. v. Hercules, Inc.,* 587 F.Supp. 144, 151–152 (E.D.Pa. 1984) (footnote omitted).

There is little that we can add to Judge McGlynn's thoughtful analysis and we adopt it as our own. Indeed, Hercules does not argue that the district court misapprehended or misapplied the elements of a *de facto* merger. Rather, Hercules argues that the district court erred in assuming that the Pennsylvania courts would apply this doctrine in an environmental nuisance case. Hercules cites *Dawejko v. Jorgensen Steel Co., supra,* for the proposition that the Pennsylvania courts, in determining whether successor liability is appropriate, will first look to see whether the same social policy considerations underlying strict products liability are thereby promoted. Since these policies would not be promoted by imposing successor liability here, it is argued, the *de facto* merger doctrine should not be applied. Hercules' contention is entirely without merit. In *Dawejko,* the Pennsylvania Superior Court adopted a new exception to the general rule of nonliability—the so-called "product-line" exception—that applies *only* in products liability cases. Not surprisingly the court did consider whether the policies of strict products liability would be promoted by adopting the product-line exception, but the court made it quite clear that it was *expanding* the reach of successor liability,

and not in any way limiting the scope of established exceptions:

One may retain the traditional exceptions but expand their boundaries, so that "merger" or "continuation" are held to include cases they once would not have included. Or one may adopt a new exception, such as the product-line exception. We believe it better to adopt a new exception.... By adopting a new exception ... the other exceptions then remaining, to deal with cases not so much affected by the policy considerations that have led to the rule of strict liability for defective products.

290 Pa.Super. at 25–26, 434 A.2d at 111. We believe that the *de facto* merger doctrine is supported by "social policy considerations" independent of any particular cause of action, *see In re Penn Central Securities Litigation,* 367 F.Supp. 1158, 1170 (E.D.Pa.1973) ("The *de facto* merger doctrine is a judge-made device for avoiding patent injustice which might befall a party simply because a merger has been called something else."), and that the Pennsylvania courts would apply it in a wide variety of cases, including this one. *See generally Farris v. Glen Alden Corp.,* 393 Pa. 427, 432, 143 A.2d 25, 28 (1958); 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 7122–7123.5 (rev. perm. ed. 1983).

### III.

Having determined that Hercules may be liable as PICCO's successor for unknown and contingent liabilities, we must analyze the relationship between Hercules and PECO as that of a vendor and remote vendee of land. Hercules argues that this relationship is governed by the rule of *caveat emptor,* subject to limited exceptions not applicable here, and that a vendee has no cause of action against a vendor sounding in private nuisance for conditions existing on the land transferred. After carefully considering this question of first impression, we are persuaded that under Pennsylvania law Hercules cannot, as a matter of law, be held liable to PECO on a private nuisance theory. The Reporter's Note to *Restatement (Second) of Torts* § 352 (1965) sums up the prevailing view regarding the liability of a vendor of land:

Under the ancient doctrine of caveat emptor, the original rule was that, in the absence of express agreement, the vendor of land was not liable to his vendee, or a fortiori to any other person, for the condition of the land existing at the time of transfer. As to sales of land this rule has retained much of its original force, and the implied warranties which have grown up around the sale of chattels never have developed. This is perhaps because great importance always has been attached to the deed of conveyance, which is taken to represent the full agreement of the parties, and to exclude all other terms and liabilities. The vendee is required to make his own inspection of the premises, and the vendor is not responsible to him for their defective condition, existing at the time of transfer.

*See also* M. Friedman, *Contracts and Conveyances of Real Property* § 1.2(n), at 37 (4th ed. 1984) ("[I]n the sale of realty this doctrine [*caveat emptor*] not only applies, it flourishes.").

As the Pennsylvania Supreme Court has said: "Generally speaking, the rule is that in the absence of fraud or misrepresentation a vendor is responsible for the quality of property being sold by him only to the extent for which he expressly agrees to be responsible.... The theory of the doctrine is that the buyer and seller deal at arm's length, each with an equal means of knowledge concerning the subject of the sale, and that therefore the buyer should be afforded only those protections for which he specifically contracts." *Elderkin v. Gaster,* 447 Pa. 118, 124, 288 A.2d 771, 774–75 (1972) (footnote omitted). In *Elderkin* the court abolished the rule of *caveat emptor* as to the sale of new homes by a builder-vendor and, in accordance with a national trend, adopted a theory of implied warranties. *See generally 6A Powell on Real Property* chap. 84A (1984). But

the reasoning of the *Elderkin* opinion[4] leaves us with no doubt that where, as here, corporations of roughly equal resources contract for the sale of an industrial property, and especially where the dispute is over a condition on the land rather than a structure,[5] *caveat emptor* remains the rule.

■ A number of general exceptions to the rule of *caveat emptor*, mostly dealing with liability for personal injuries or property damage resulting from latent dangerous conditions, have been recognized. *See Quashnock v. Frost*, 299 Pa.Super. 9, 445 A.2d 121 (1982); *Shane v. Hoffmann*, 227 Pa.Super. 176, 324 A.2d 532 (1974); *Restatement (Second) of Torts* § 353; Annot., 18 A.L.R.4th 1168 (1982); Annot., 48 A.L.R.3d 1027 (1973). PECO concedes that these exceptions do not apply in this case. (Indeed, PECO appears to argue that because the exceptions do not apply, neither does the rule. This, of course, does not follow.) PECO's tack has been to cast its cause of action for the condition of the Chester site as one for private nuisance. We, however, do not believe that PECO can escape the rule of *caveat emptor* by this route.

*Restatement (Second) of Torts* § 821D defines a "private nuisance" as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." The briefs and arguments, as well as the district court's opinion, 587 F.Supp. at 152–54, give much attention to the questions of whether the condition created by Hercules on the Chester site amounted to a nuisance, and whether Hercules remains liable for the nuisance even after vacating the land.

For the purposes of our decision, we may assume that Hercules created a nuisance, and that it remains liable for this condition. See *Restatement (Second) of Torts* § 840A. The crucial and difficult question for us is *to whom* Hercules may be liable.

The parties have cited no case from Pennsylvania or any other jurisdiction, and we have found none, that permits a purchaser of real property to recover from the seller on a private nuisance theory for conditions existing on the very land transferred, and thereby to circumvent limitations on vendor liability inherent in the rule of *caveat emptor*. In a somewhat analogous circumstance, courts have not permitted *tenants* to circumvent traditional limitations on the liability of *lessors* by the expedient of casting their cause of action for defective conditions existing on premises (over which they have assumed control) as one for private nuisance. *See Collette v. Piela*, 141 Conn. 382, 106 A.2d 473 (1954); *Clerken v. Cohen*, 315 Ill.App. 222, 42 N.E.2d 846 (1942). In *Harris v. Lewistown Trust Co.*, 326 Pa. 145, 191 A. 34 (1937), *overruled in part on other grounds, Reitmeyer v. Sprecher*, 431 Pa. 284, 243 A.2d 395 (1968), the Supreme Court of Pennsylvania held that the doctrine that a landlord not in possession may be liable for injuries resulting from a "condition amounting to a nuisance" is confined to "the owners or occupants of near-by property, persons temporarily on such property, or persons on a neighboring highway or other places." 326 Pa. at 153, 191 A. at 38.[6] Recovery on this theory was not available to tenants or their invitees: "A breach of duty owed to one class of persons cannot create a cause of action in favor of a person not within the

---

**4.** *Elderkin,* like other decisions adopting implied warranty theories, is based on the theory that as between the builder-vendor and the home buyer, the builder-vendor is in by far the better position in terms of expertise and bargaining power. We find no reason to assume such a disparity exists in the instant case.

**5.** Compare those cases holding that there are no implied warranties in the sale of unimproved land. *Conklin v. Hurley,* 428 So.2d 654 (Fla. 1983); *Witty v. Schramm,* 62 Ill.App.3d 185, 19 Ill.Dec. 669, 379 N.E.2d 333 (1978); *Cook v.*

*Salishan Properties,* 279 Or. 333, 569 P.2d 1033 (1977); *Jackson v. River Pines, Inc.,* 276 S.C. 29, 274 S.E.2d 912 (1981).

**6.** *Cf. Restatement (Second) of Torts* § 840A and comment c thereto ("If the vendor or lessor has himself created on the land a condition that results in a nuisance, .... *his responsibility toward those outside of his land* is such that he is not free to terminate his liability to them ... by passing the land itself on to a third person.") (emphasis added).

class. A plaintiff must show that as to him there was a breach of duty." 326 Pa. at 152, 191 A. at 38.[7] Similarly, under the doctrine of *caveat emptor* Hercules owed only a limited duty to Gould and, in turn, to PECO. PECO concedes that this duty was not violated. PECO cannot recover in private nuisance for the violation of a duty Hercules may have owed to others—namely, its neighbors.[8]

We believe that this result is consonant with the historical role of private nuisance law as a means of efficiently resolving conflicts between *neighboring*, contemporaneous land uses. *See Essick v. Shillam*, 347 Pa. 373, 376, 32 A.2d 416, 418 (1943) ("An owner has a right, barring malice and negligence, to any use of his property, unless by its continuous use he prevents *his neighbors* from enjoying the use of their property to their damage.") (emphasis added).[9] All of the very useful and sophisticated economic analyses of private nuisance remedies published in recent years proceed on the basis that the goal of nuisance law is to achieve efficient and equitable solutions to problems created by *discordant* land uses.[10] In this light nuisance law can be seen as a complement to zoning regulations, *see* Beuscher & Morrison, *Judicial Zoning Through Recent Nuisance Cases*, 1955 Wis.L.Rev. 440, 452 ("[T]he state in nuisance cases is exercising, through the judicial arm, the same basic power of the sovereign that it exercises through the legislative arm in zoning."), and not as an additional type of consumer protection for purchasers of realty. Neighbors, unlike the purchasers of the land upon which a nuisance exists, have no opportunity to protect themselves through inspection and negotiation. The record shows that PECO acted as a sophisticated and responsible purchaser—inquiring into the past use of the Chester site, and inspecting it carefully. We find it inconceivable that the price it offered Gould did not reflect the possibility of environmental risks, even if the exact condition giving rise to this suit was not discovered.

Where, as here, the rule of *caveat emptor* applies, allowing a vendee a cause of action for private nuisance for conditions existing on the land transferred—where there has been no fraudulent concealment—would in effect negate the market's allocations of resources and risks, and sub-

---

**7.** The limitation on landlord liability that the *Harris* case imposed—preventing recovery by a lessee injured due to a condition the landlord promised to repair—was much criticized and eventually overruled by *Reitmeyer*. We believe, however, that insofar as it stands for the proposition that salutary limitations on vendor or lessor liability to vendees and lessees cannot be circumvented by asserting a breach of a duty owed to third parties, *Harris* reflects sound tort theory.

**8.** The record shows that prior to its purchase of the Chester site, PECO also owned an adjoining piece of land, and thus was a neighbor of Hercules. PECO does not, however, allege that pollution of the Chester site interfered with its use and enjoyment of this adjoining site.

**9.** *See also 5 Powell on Real Property* § 704, at 320 ("The basic criterion in the whole law of private nuisance is reasonableness of conduct.... The conclusion of 'unreasonableness' depends then upon liability-inviting conduct of the defendant plus a finding that this conduct violates a protected interest of the *neighbor-plaintiff*.") (emphasis added); Rabin, *Nuisance Law: Rethinking Fundamental Assumptions*, 63

Va.L.Rev. 1299, 1319 (1977) ("An interference is not a nuisance unless, among other things, it *substantially* interferes with the use and enjoyment of *neighboring land*.") (emphasis added); 2 F. Pollock & F. Maitland, *The History of English Law* 53 (2d ed. 1911) (Nuisance is caused "by things erected, made, or done *not on the soil possessed by the complainant but on neighboring soil*,.... Law endeavours to protect the person who is seized of land, not merely in the possession of the land, but in the enjoyment of those rights *against his neighbours* which he would be entitled to were he seized under a good title.") (emphasis added).

**10.** *See generally* Calabresi & Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv.L.Rev. 1089 (1972); Ellickson, *Alternatives to Zoning: Covenants, Nuisance Rules, and Fines as Land Use Controls*, 40 U.Chi.L.Rev. 681 (1973); Polinsky, *Resolving Nuisance Disputes: The Simple Economics of Injunctive and Damage Remedies*, 32 Stan.L.Rev. 1075 (1980); Rabin, *Nuisance Law: Rethinking Fundamental Assumptions*, 63 Va.L. Rev. 1299 (1977); Comment, *Internalizing Externalities: Nuisance Law and Economic Efficiency*, 53 N.Y.U.L.Rev. 219 (1978).

ject vendors who may have originally sold their land at appropriately discounted prices to unbargained-for liability to remote vendees. To so extend private nuisance beyond its historical role would render it little more than an epithet, "and an epithet does not make out a cause of action." *Miller v. Morse,* 9 A.D.2d 188, 192 N.Y.S.2d 571, 576 (1959). Such an extension of common law doctrine is particularly hazardous in an area, such as environmental pollution, where Congress and the state legislatures are actively seeking to achieve a socially acceptable definition of rights and liabilities. We conclude that PECO did not have a cause of action against Hercules sounding in private nuisance.

## IV.

 The doctrine of public nuisance protects interests quite different from those implicated in actions for private nuisance, and PECO's claim for public nuisance requires separate consideration. Whereas private nuisance requires an invasion of another's interest in the private use and enjoyment of land, a public nuisance is "an unreasonable interference with a right common to the general public." *Restatement (Second) of Torts* § 821B(1). An action for public nuisance may lie even though neither the plaintiff nor the defendant acts in the exercise of private property rights.[11] As William Prosser once wrote:

There are, then, two and only two kinds of nuisance, which are quite unrelated except in the vague general way that each of them causes inconvenience to someone, and in the common name, which naturally has led the courts to apply to the two some of the same substantive rules of law. A private nuisance is narrowly restricted to the invasion of

interests in the use and enjoyment of land. It is only a tort, and the remedy for it lies exclusively with the individual whose rights have been disturbed. A public nuisance is a species of catch-all low-grade criminal offense, consisting of an interference with the rights of the community at large, which may include anything from the blocking of a highway to a gaming-house or indecent exposure. Although as in the case of other crimes, the normal remedy is in the hands of the state, a public nuisance may also be a private one, when it interferes with private land. The seeds of confusion were sown when courts began to hold that a tort action would lie even for a purely public nuisance if the plaintiff had suffered "particular damage."

Prosser, *Private Action for Public Nuisance,* 52 Va.L.Rev. 997, 999 (1966) (footnotes omitted). In analyzing the public nuisance claim, we are not concerned with the happenstance that PECO now occupies the very land PICCO occupied when it allegedly created the condition that has polluted the Delaware River waters,[12] or that the continuing source of that pollution is located on that land.[13] The question before us is whether PECO has *standing* to bring an individual action for damages or injunctive relief for interference with a public right.

 *Restatement (Second) of Torts* § 821C(1) provides:

In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.

---

**11.** Thus, commercial fishermen and clam diggers operating in public waters can recover on a public nuisance theory for harm to the waters and marine life caused by oil discharged from a tanker in transit. *See Burgess v. M/V Tamano,* 370 F.Supp. 247 (D.Me.1973).

**12.** Though Hercules disputes it, we may assume that the jury could properly have found that the leaching of resins into the Delaware River was a

public nuisance and that PICCO was responsible for it.

**13.** Accordingly, we reject Hercules' contentions that the limitations on private nuisance discussed in Part III, *supra,* apply equally to public nuisance, and that it is improper for a claimant to recover for or seek abatement of public nuisance when the alleged cause of the public nuisance is its own property.

**316**

The same requirements apply to individual plaintiffs seeking injunctive relief. *Restatement (Second) of Torts* § 821C(2); Prosser, *supra,* 52 Va.L.Rev. at 1006. PECO argues that the expense it incurred in cleaning up the offending condition constituted the harm requisite for standing to sue for public nuisance. We disagree. Though pecuniary harm certainly may be harm of a different kind from that suffered by the general public, *see Restatement (Second) of Torts* § 821C comment h,[14] we find in this case no allegation or evidence that PECO suffered this harm "exercising the right common to the general public that was the subject of interference." The public right that was interfered with was the right to "pure water". *See Commonwealth v. Barnes & Tucker Company,* 455 Pa. 392, 412–13, 319 A.2d 871, 882 (1974); Pa. Const. art. I, § 27. PECO does not allege that it used the waters of the Delaware River itself, or that it was directly harmed in any way by the pollution of those waters. Thus, this is not a case "where an established business made commercial use of the public right with which the defendant interfered." Prosser, *supra,* 52 Va.L.Rev. at 1013–14 (footnote omitted). If PECO—as a riparian landowner—had suffered damage to its land or its operations as a result of the pollution of the Delaware, it would possibly have a claim for public nuisance. But the condition of the Chester site was not the *result* of the pollution, it was the *cause* of it. DER required PECO, as owner of the Chester site, to remove the sources of the pollution. PECO has been specially harmed only in the exercise of its private property rights over the Chester site. PECO has suffered no "particular damage" in the exercise of a right common to the general public, and it lacks standing to sue for public nuisance.

## V.

PECO argues that even if, as we have now held, it had no cause of action against Hercules for public or private nuisance, insofar as the judgment of the district court assessed damages against Hercules it should be affirmed on common law principles of indemnification. The short answer to PECO's contention is that under Pennsylvania law a cause of action for indemnity between jointly liable defendants and a plaintiff's cause of action for the underlying wrong are entirely distinct, *see Carlin v. Pennsylvania Power and Light Company,* 363 Pa. 543, 70 A.2d 349 (1950), and as an appellate court we should be chary of upholding a judgment on the basis of a *cause of action* that was neither pleaded, proved, nor submitted to the jury by the district court. Perhaps this would be possible were there a complete identity of factual issues,[15] but a brief review of the principles of indemnification show that such is not the case here.

Under Pennsylvania law, the right to indemnity "enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation to pay damages occasioned by the negligence of another." *Burbage v. Boiler Engineering & Supply Company,* 433 Pa. 319, 326, 249 A.2d 563, 567 (1969). Under a threat of legal action by the DER pursuant to the Pennsylvania Clean

**14.** It may be that under Pennsylvania law harm of a *magnitude* greater than that suffered by the general public is sufficient to confer standing. *See Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises,* 428 Pa. 350, 360, 237 A.2d 342, 348 (1968). This distinction is not, however, important in the instant case. As the discussion that follows points out, even if PECO has suffered a harm both different in kind and greater in degree than that suffered by the general public, it has not suffered that harm in the exercise of a right common to the general public. *Cf. Burgess v. M/V Tamano,* 370 F.Supp. 247 (D.Me.1973) (businesses operating on beach did not have standing to sue for pollution of swimming waters, even though they lost customers as a result.).

**15.** "An appellate court may affirm a result reached by the district court on different reasons, *as long as the record supports the judgment.*" *Guthrie v. Lady Jane Collieries, Inc.,* 722 F.2d 1141, 1145 n. 1 (3d Cir.1983) (emphasis added). Where, as here, a case is tried before a jury under one cause of action, it seems most unlikely that the record could support affirmance of a judgment for the plaintiff on the basis of an entirely distinct cause of action.

Streams Law, PECO negotiated and carried out a plan to clean up the Chester site. (The jury's verdict against Hercules reflected the cost PECO incurred in implementing the clean-up.) PECO was not, however, required to fight DER to a final judgment in order to be eligible for indemnity. It is not penalized for acting responsibly. "To recover indemnity where there has been such a voluntary payment, however, it must appear that the party paying was *himself legally liable* and could have been compelled to satisfy the claim." *Tugboat Indian Company v. A/S Ivarans Rederi*, 334 Pa. 15, 21, 5 A.2d 153, 156 (1939) (emphasis in original).[16]

"Thus, the indemnitee may be required to establish his case against the indemnitor in the same way that the claimant against him would have been obligated to do, namely, by a preponderance of the evidence. A mere showing by a party seeking indemnity that there was a reasonable possibility that it might have been held liable if it had not settled ... is not sufficient to recover indemnity; actual legal liability must be shown." 41 Am.Jur.2d *Indemnity* § 33, at 723 (1968) (footnotes omitted). *See also Martinique Shoes v. New York Progressive Wood Heel Company*, 207 Pa.Super. 404, 217 A.2d 781 (1966). The issue of liability, of PECO or Hercules, under the Clean Streams Law pursuant to which the DER purported to act,[17] has not been tried. Though the Clean Streams Law declares that all violations are nuisances, that does not mean that all public nuisances give rise to liability under this statute. The jury has not been instructed as to the elements of such liability[18] and its answers to the special interrogatories cannot be transmuted into findings on this issue.[19] Thus, we cannot on the basis of this record uphold the award of damages on PECO's indemnification theory.

■■■ Even if the record clearly supported the conclusion that PECO "could have been compelled" through legal action by DER pursuant to the Clean Streams

---

**16.** It is further required that the party seeking indemnity give "proper notice" and "establish that the settlement was fair and reasonable." *Id.* Hercules has not disputed that it was informed of PECO's negotiations with DER, and that the amounts PECO expended in cleaning up the Chester site were reasonable.

**17.** The Clean Streams law provides that "[n]o person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department [DER] or such person or municipality has first obtained a permit from the department.... A discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance." 35 Pa.Stat. Ann. § 691.307 (Purdon Supp.1983).

It is doubtful that DER could have compelled PECO to clean up the Chester site on a common law public nuisance theory, since the common law, in contrast to the Clean Streams Law, imposed liability only on those whose conduct (even if without fault) had been a legal cause of the nuisance, and not simply on the basis of ownership of the offending land. *Compare Commonwealth v. Barnes & Tucker Co.*, 23 Pa. Commw. 496, 509–510, 353 A.2d 471, 478–79 (1976), *aff'd,* 472 Pa. 115, 371 A.2d 461, *appeal*

*dismissed,* 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977), *with National Wood Preservers v. Commonwealth,* 489 Pa. 221, 237–240, 414 A.2d 37, 45–47, *appeal dismissed,* 449 U.S. 803, 101 S.Ct. 47, 66 L.Ed.2d 7 (1980).

**18.** PECO's eleventh-hour attempt to add a claim against Hercules based on the Clean Streams Law was denied. Nonetheless, the jury was instructed as follows:

There is a statute of Pennsylvania which provides it shall be unlawful for any person, and person includes corporations, or a municipality, to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from the property owned or occupied by such person or municipality, any substance of any kind or character resulting in pollution.
Now, if you find there was a violation of this statute, you must find there was created a public nuisance as a matter of law.

This instruction, dealing with the public nuisance claim, cannot be construed as placing liability under the Clean Streams Law at issue. Though we need not reach the question, this instruction may have been so incomplete as to be prejudicial error.

**19.** Nor are DER's allegations, contained in its letters to PECO, *see* Part I *supra,* conclusive of the issue of liability under the Clean Streams Law.

Law to incur these expenses in cleaning up the condition created by PICCO, it is not at all clear that under Pennsylvania law Hercules is liable over to PECO for indemnity. "The right of indemnity rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by law to an injured party." *Burbage v. Boiler Engineering & Supply Company*, 433 Pa. at 326, 249 A.2d at 567.

> The difference between primary and secondary liability is not based on a difference in degrees of negligence or on any doctrine of comparative negligence but rather on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligations owed by each of the wrongdoers to the injured person. Secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal obligation between the parties or arising from some positive rule of statutory or common law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.

433 Pa. at 326–67, 249 A.2d at 567 (emphasis in original). There can be no indemnity as between parties that each bear primary responsibility for a wrong, regardless of their relative degrees of fault. Here we have the converse situation. Both PECO and Hercules are liable for the condition of the Chester site, if at all, vicariously— PECO as the successor to PICCO in title to the land, Hercules as the successor to PICCO's other assets. We have found no Pennsylvania case determining where the risk of loss falls in such circumstances. At least one court has held that there can be no common law indemnification as between two parties whose liability is vicarious. *See Liberty Mutual Insurance Company v. Curtis Noll Corporation*, 112 Mich.App. 182, 315 N.W.2d 890 (1982) (two "product-line" successors to company that manufac-

tured defective product). Arguably, the liability of a party that has constructively merged with a polluter is of a character or kind different from that of a party who succeeded to title in the offending land. We need not, however, attempt to ascertain what general rule the Supreme Court of Pennsylvania would adopt. "Indemnity turns upon what is equitable and fair in measuring the comparative responsibilities of these defendants, should both be held liable." *District of Columbia v. Nordstrom*, 327 F.2d 863, 867 (D.C.Cir.1963); *see also United States v. Savage Truck Line*, 209 F.2d 442, 447 (4th Cir.1953) ("[T]he inquiry is always whether the difference in the gravity of the faults of the participants is so great as to throw the whole loss upon one."), *cert. denied*, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954). In the special circumstances of this case— where the Chester site had been sold by PICCO well before the acquisition of PICCO's other assets by Hercules, and where PECO had an opportunity to protect itself through inspection and negotiation—neither considerations of equity nor considerations of which party was best situated to prevent the pollution of the Delaware River waters compel the conclusion that the entire loss ought to be shifted from PECO to Hercules. Indeed, essentially the same policy considerations that counsel adherence to the rule of *caveat emptor* in this situation militate against shifting the loss to Hercules on an indemnity theory. We conclude that the judgment of the district court cannot be affirmed, insofar as it assessed damages, on a theory of common law indemnification.

We emphasize that our decision today should not be interpreted as standing for the general proposition that a party that contaminates land, or the successors to its assets, can escape liability by the expedient of selling the land. To the contrary, it would seem that there are many avenues by which such a party may be held accountable.[20] We hold only that in this case the

---

**20.** For example, Hercules could be liable to neighboring landowners in private nuisance, or

to users of Delaware River waters in public nuisance. DER or the federal Environmental

purchaser of that land, PECO—though we recognize that it acted as a responsible corporate citizen—had no cause of action against the vendor's successor, Hercules, for private nuisance, public nuisance, or common law indemnity.

## CONCLUSION

For the foregoing reasons, the injunction requiring Hercules to clean up the Chester site will be vacated, and the judgment of the district court on PECO's claims against Hercules will be reversed.

Protection Agency may be able to proceed directly against Hercules on statutory or public