**MAHOGANY RUN CONDOMINIUM ASSOCIATION, INC.,**
**Plaintiff**

**v.**

**ICG REALTY MANAGEMENT CORP., Defendant**

Civ No. 97-185

Civ. No. 96-85

District Court of the Virgin Islands

Div. of St. Thomas and St. John

February 16, 1999

ADAM G. CHRISTIAN, St. Thomas, *for plaintiff*

KEVIN F. D'AMOUR, St. Thomas and New Jersey, *for defendants*

MOORE, *Judge*

## INTRODUCTION

These consolidated matters, Civil No. 96-85 ["Marilyn Action"] and Civil No. 97-185 ["Bertha Action"], were tried before this Court sitting without a jury.

The plaintiff, Mahogany Run Condominium Association [the "Association"], is a condominium association comprising 241 units on the north side of St. Thomas. Defendant Peter D. Beekman ["Beekman"], along with his wife, who is not involved in this matter, is sole shareholder and director of ICG Realty Management Corporation ["ICG"] [collectively "the defendants"].[1] Beekman appears to own three units at Mahogany Run in his own name. For purposes of this case, ICG is a mortgagee of an additional fifteen units, though People's Bank is the first-priority mortgagee on these units due to a subordination agreement signed July 27, 1993. The issue before this Court is whether the defendants have committed tortious interference with contract, nuisance, or any violation of Virgin Islands statute. The Association seeks compensatory and punitive damages and to "pierce the corporate veil."

Mahogany Run Condominiums ["Mahogany Run"] are insured against hurricane damage under an insurance policy with Royal Insurance Co. of Puerto Rico ["Royal"]. The policy was obtained by the Association at the expense of and for the benefit of Mahogany Run unit owners and their mortgagees. On September 19, 1994, an endorsement was added to the policy designating fourteen mortgages as loss payees, including ICG. On September 15, 1995, Hurricane Marilyn struck and inflicted much damage to Mahogany Run. ICG advised Royal's agent, Theodore Tunick &

---

[1] Beekman owns ICG through several corporate layers. The Association's assertion that ICG is not a true mortgagee is before the Territorial Court in one of several cases involving the same parties.

405

Co. ["Tunick"], that pursuant to the 1994 endorsement, ICG should be named as a loss payee on any insurance check for hurricane damage. Tunick issued two checks without naming ICG as loss payee, and two final checks with ICG named as loss payee. Before the final settlement checks were cut, ICG became concerned about various aspects of the Association's handling of the proceeds and requested certain information. The Association presented testimonial evidence that it provided the information; the defendants asserted that the information provided was inadequate. The Court makes no finding on this matter since this disputed fact is irrelevant.

On April 26, 1996, the Association received a check for $2,550,000, and on May 1, 1996, the Association received the final check for $6,850,000, payable to the Association, ICG and Swerling, Milton & Winnick, Public Adjuster. All other loss payees had provided prior written endorsements to Royal. ICG was notified of the receipt of the latter check the next day, Thursday, May 2nd. On May 3rd, the Association confirmed that ICG would endorse the check the next business day, Monday, May 6th, and one of the directors of the Association flew to Connecticut. Mr. Beekman signed on behalf of ICG on Sunday, May 5th. After the director obtained the last endorsement, that of the insurance adjuster, the check was deposited on May 6th.

Approximately one month later, the Association entered into a lump-sum repair contract with The Evans-American Corporation. The Association concedes that there was no delay occasioned in the repair efforts through ICG's refusal to provide prior written approval of the deposit of funds. The following month, July of 1996, Hurricane Bertha struck St. Thomas and further damaged Mahogany Run. Royal issued a check on May 9, 1997, in the amount of $768,601 payable to the Association, ICG and other loss payees. ICG refused to endorse the check until the Association provided certain information, including an "accounting of the insurance proceeds . . ., the proposed distribution/use of the proceeds, and . . . the proposed allocation to each unit owner of the proceeds." The Association refused to provide all of the requested information.

Although all other loss payees provided their endorsements, the check could not be negotiated without ICG's signature. The

Magistrate Judge ordered that the check be deposited in an interest-bearing account on December 15, 1997, and again on March 3, 1998. The Association appealed that Order, but ultimately signed the check into the registry of the Court on April 20, 1998. By that time, both suits had been filed seeking not only the claims set out above, but also a preliminary injunction to order the defendants to sign the check over to plaintiffs. After a hearing on April 27, 1998, the preliminary injunction was denied.

## ANALYSIS

### Tortious Interference with Contract

■ Intentional and improper interference with the performance of a contract between two other parties by causing one of those parties not to perform the contract can result in liability for the non-performance. *See, e.g.*, Restatement (Second) of Torts § 766 (1979) [sometimes "Restatement"]. A claim for tortious interference requires "the third person's failure to perform." *Gov't Guarantee Fund v. Hyatt Corp.*, 35 V.I. 356, 955 F. Supp. 441, 452 (D.V.I. 1997). This Court simply cannot find any failure to perform on the part of the third party, Royal. *See, e.g., Crosby v. Crosby*, 986 F.2d 79, 83 (4th Cir. 1993) ("An insurer is discharged from all subsequent liability when it makes good faith payments to a purported beneficiary without notice of any competing claims.").[2]

The claim for tortious interference will be dismissed.

### Nuisance

■ The Association alleged that the Defendant's acts constituted a private nuisance. The Restatement provides that "[a] private nuisance is a nontresspassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts § 821D. The understood common law basis for a nuisance is an act arising out of the use of land which likewise affects

---

[2] The Association argues that pursuant to local statute, when a check is issued for payment of an obligation, that obligation is not discharged until presentment and honoring of the check. 11A V.I.C. § 3-802(1)(B). That provision, however, primarily deals with the relationships between drawer and drawee banks. While it would certainly be true that the obligation would not be discharged if the check had in fact been presented and dishonored, the converse is not the case.

another's use of land. *See, e.g., Sarnicandro v. Lake Developers, Inc.,* 55 N.J. Super. 475, 151 A.2d 48 (App. Div. 1959) (no nuisance where no interference with land); *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 314 (3d Cir. 1985) (nuisance law resolves conflicts "between neighboring contemporaneous land users."); *Amland Properties Corp. v. Aluminum Co. of Amer.,* 711 F. Supp. 784, 807 (D.N.J. 1989) (Section 822 embodies the traditional concept of a pivate nuisance as the use of one's property either to interfere with another's use of her property or to injure a second party.). Failure to endorse a check has nothing to do with interference arising out of the use of real property and simply cannot amount to a nuisance. Plaintiff's private nuisance claim also will be dismissed.

## Violation of Virgin Islands Law

Plaintiff contended that it, as the incorporated manager and association of unit owners of Mahogany Run, had the sole authority as trustee to receive the insurance proceeds from the hurricane claims under the Virgin Islands Condominium Act ["Condominium Act"], 28 V.I.C. §§ 901-27.[3] Plaintiff relied on section 924, which obligated plaintiff to insure the property against loss in its name "as trustee for each of the apartment owners in the percentages established in the declaration." The law also provides that premiums for this insurance would be shared by all apartment owners as common expenses.[4] The difficulty confronting the Court is that the

---

[3] Additionally, the Association's Bylaws provide that "[a]ll such insurance coverage obtained by the Board of Directors shall be written in the name of the Association as Trustee for each of the Owners." (Pl. Exh. B, Bylaws, Article VII, Section 1.)

[4] The full text of the Condominium Act's insurance provision is as follows:

The manager or the Board of Directors, if required by the Declaration, bylaws or by a majority of the apartment owners, or at the request of a mortgagee having a first mortgage of record covering an apartment, shall have the authority to, and shall obtain insurance for the property against loss or damage by fire and such other hazards under such terms and for such amounts as shall be required or requested. Such insurance coverage shall be written on the property in the name of such manager or of the Board of Directors of the Association of Apartment Owners, as trustee for each of the apartment owners in the percentages established in the declaration. Premiums shall be common expenses. Provisions for such insurance shall be without prejudice to the right of each apartment owner to insure his own apartment for his benefit.

28 V.I.C. § 924.

Royal insurance policy, through later endorsement, named the mortgagees of individual units as loss payees.

While there may be policy considerations in favor of a different statutory provision for insuring condominium units, section 924 is the provision in effect in the Virgin Islands.[5] Accordingly, the Association not only had the responsibility to insure the condominium property, it also had the statutory right to receive the hurricane insurance proceeds and determine how best to use the money to repair, reconstruct or rebuild the condominium structures. *See id.* § 925 (the association of apartment owners have sixty days to decide whether to repair, reconstruct or rebuild the damaged structures).

■ Since the statute, 28 V.I.C. § 924, overrides the provisions in any insurance policy to the contrary, an entity that takes back a mortgage on a condominium unit must be held to do so with knowledge of the local statute governing casualty insurance on that apartment unit and the horizontal condominium regime of which it is a part. Such a mortgagee of a condominium apartment unit thus cedes control over the use of the proceeds from a casualty insurance claim to the association of unit owners, no matter what endorsements in favor of mortgagees may be added to the master policy obtained by the association of unit owners. Accordingly, the Court finds that ICG had no right to use the mortgagee loss payee endorsement as a means to control how the Association as statutory trustee used the Marilyn and Bertha insurance proceeds to rebuild and repair the units.

---

[5] The conflicting interests of association of condominium unit owners as a whole, the individual unit owner, and the lenders who have financed the unit owners need careful consideration by legislatures enacting casualty insurance provisions. Of particular concern is

placing post-casualty control of insurance in the hands of the association. The mortgagees's right to adjust losses with the carrier and to control restoration would both be lost; the latter could lead to inadequate repairs, misappropriation, or attachment of proceeds by a creditor. In addition, reliance upon a master policy would implicitly negate the time-honored option of the mortgagee to apply insurance proceeds to the mortgage debt.

Patrick J. Rohan & Melvin A. Reskin, Real Estate Transactions: Condominium Law and Practice § 47.03[3] (Matthew Bender) (1998). Section 924, however, places such post-casualty control squarely in the hands of the condominium association and its board of directors.

## Calculation of Damages

*Marilyn Action*: Since the signature of the adjusters was also necessary and not obtained until after that of ICG, plaintiff has not shown that it suffered damage from any delay caused by obtaining ICG's written endorsement on the Marilyn check. Hence, the Association will not be awarded any damages in the Marilyn Action.

*Bertha Action*: The Association received the check on May 9, 1997, but did not advise ICG of its receipt until June 12, 1997. (See Pl. Exh. L.) On December 15, 1997, the Magistrate Judge ordered the check to be deposited in an interest bearing account and it was finally so deposited on April 20, 1998.

ICG correctly notes that the Association was required to mitigate its damages. "One injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.' RESTATEMENT (SECOND) OF TORTS § 918 (1977). Since the Court finds that the measure of damages plaintiff seeks is the interest lost in ICG's delay in endorsing the check, the Associations' damages have been fully mitigated since April 20, 1998.

■ The Court will award as damages the interest that would have accrued from the time ICG was made aware of the receipt of the insurance proceeds check to the time the magistrate judge ordered the check deposited into the registry of the Court. The period from December 15, 1997, to April 20, 1998, will be excluded because this delay resulted from plaintiff's appeal of the order of the magistrate judge. The damages will be calculated at the legal rate of nine percent simple interest per annum. Since the Court can recall no testimony supporting ICG's contention that it was always willing to have the check put in an interest bearing account, the Court will award $35,440 as damages in the Bertha Action ($768,601 x 9% x 187 days (June 12 to December 15, 1997) 365 (days per year)).

■ The Court will assess damages only against ICG as mortgagee. Although Beekman was named as a defendant in the Bertha Action, the Association failed to prove the factors necessary under

410

New York law[6] to justify setting aside the corporate veil and making Beekman liable with his corporation. The evidence is uncontroverted that Beekman and ICG observed the required corporate formalities. There is no evidence that Beekman exercised the complete domination over ICG which New York requires to pierce the corporate veil on behalf of a party allegedly injured by the exercise of such domination. *See, e.g., Morris v. New York State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141, 623 N.E.2d 1157, 1160-61, 603 N.Y.S.2d 807 (1993) ("piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Id.*)[7]

## CONCLUSION

The Court thus finds that plaintiff is entitled to interest damages in the amount of $35,440. Any funds in the Court's registry for the Bertha Action shall be released to the plaintiff forthwith. An appropriate order follows.

ENTERED this 16th day of February, 1999.

### ORDER

The premises considered, the Court finds that the plaintiff is entitled to interest damages for the Bertha Action only, as discussed in the accompanying Memorandum, the Court will award $35,440 as damages in the Bertha Action ($768,601 x 9% x 187 days

---

[6] Applying 1 V.I.C. § 4, under the applicable restatement, "the local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to . . . its creditor for corporate debts.' THE RESTATEMENT (SECOND) OF CONFLICTS § 307 (1971). ICG is incorporated in the State of New York and therefore New York law governs this question.

[7] *See also Thrift Drug, Inc. v. Universal Prescription Adm'rs.*, 131 F.3d 95, 97 (2d Cir. 1997) (same); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (indicia of a dominated corporation *vel non*: observation of corporate formalities; adequacy of capitalization; funds of corporation used for personal purposes; overlap in ownership, officers, directors, and personnel; sharing common office space, address and telephone numbers; business discretion displayed by allegedly dominated corporation; alleged dominator dealing with corporation at arms length; corporation treated as an independent profit center; others paying or guaranteeing debts of dominated corporation; alleged dominator using property of corporation as dominator's own).

(June 12 to December 15, 1997) 365 (days per year)). The plaintiff is entitled to the moneys previously deposited in the Court's registry and the accompanying interest earned thereon and these moneys should be released to the plaintiff forthwith.

ENTERED this 16th day of February, 1999.