ACTION MANUFACTURING CO.,
INC., et al., Plaintiffs,

v.

SIMON WRECKING CO.,
et al., Defendants.

No. Civ.A. 02–CV–8964.

United States District Court,
E.D. Pennsylvania.

Aug. 31, 2005.

David E. Romine, Larry D. Silver, Langsam, Langsam, Stevens & Silver, LLP, Jeannette M. Brian, Leigh W. Marquardt, Conrad, O'Brien, Gellman & Rohn, PC, Philadelphia, PA, Sandra G. Gibbs, Manko, Gold, Katcher & Fox, Bala Cynwyd, PA, for Plaintiffs.

Philip L. Hinerman, Fox, Rothschild, LLP, J. Robert Stoltzfus, Robert L. Collings, Schnader, Harrison, Segal & Lewis LLP, Philadelphia, PA; George J. Ozorowski, Hughes, Kalkrenner & Adshead LLP, Plymouth Meeting, PA; C. Shawn Dryer, Kevin K. Douglass, Matthew C. Landreth, Robert W. Thomson, Babst, Calland, Clements & Zomnir, PC, Pittsburgh, PA; David J. Staudt, Rees A. Griffiths, Barley, Snyder, Senft & Cohen, LLC, York, PA; Matthew H. Haverstick, Megan Reardon Ford, Barley, Snyder, Lancaster, PA; Madelaine R. Berg, Stroock, Stroock & Lavan LLP, New York, NY; Joseph D. Picciotti, Pittsford, NY, for Defendants.

Lightman Drum Co., Inc., c/o Jerome Lightman, Berlin, NJ, Defendants pro se.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

### I. INTRODUCTION

Plaintiffs [1] (collectively referred to as "Action Manufacturing") bring this action against defendants [2] pursuant to the Com-

---

1. Plaintiffs are ABB, Inc., f/k/a Fischer & Porter Company; Action Manufacturing Co., Inc.; Alcoa, Inc., f/k/a Aluminum Company of America; Armstrong World Industries, Inc.; Beckett Company, L.P.; General Electric Company/RCA; General Motors Corporation; Hamilton Technologies, Inc. (Bulova Technologies, L.L.C.); Hamilton Watch Company, Inc. (Swatch Group, U.S., Inc.); Handy & Harman, Tube Co.; Hayfork, L.P., f/k/a Hamilton Precision Metals, Inc.; Hercules Incor-

porated; J.W. Rex; Lafrance Corporation; Lucent Technologies, Inc.; Penflex, Inc.; Plymouth Tube Company; Reilly Plating Company; Siemens Energy & Automation, Inc., f/k/a Moore Products, Co.; Sunroc Corporation, Inc.; Syntex (USA) Inc.; Unisys Corporation; and Viz Liquidation Trust.

2. The defendants remaining in this action are Simon Wrecking Company, Inc.; Simon Resources, Inc.; Mid–State Trading Company, Inc.; S & S Investments, Inc.; Schwab–Si-

prehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), and Pennsylvania's Hazardous Site Cleanup Act, 35 Pa. Stat. Ann. § 6020.101 *et seq.* ("HSCA"), for contribution and cost recovery of past and future response costs incurred in the environmental cleanup of a site located in Malvern, Pennsylvania (the "Malvern Superfund Site"). Plaintiffs also seek declaratory judgment. Jurisdiction is appropriate under 28 U.S.C. §§ 1331 & 1367. Plaintiff Action Manufacturing alleges liability against defendant Marcegaglia USA, Inc. ("Marcegaglia") as a successor-in-interest to the Bishop Tube Company ("Bishop Tube"). Currently before me is Marcegaglia's motion for summary judgment on the basis that it is not liable as a successor to Bishop Tube. For the reasons set forth below, Marcegaglia's motion is granted.

## II. BACKGROUND

### A. Bishop Tube and the Malvern Superfund Site

Bishop Tube, located in Frazer, Pennsylvania, was founded in 1842 for the manufacture of gold and platinum alloys for technical and industrial uses. (Pl.'s Resp. Ex. 5 at 13789.) For all time periods relevant to this case, Bishop Tube manufactured metal alloy tubing in sizes ranging from 0.125" to 2" in diameter. (*Id.* at 13783.) These tubes were used in a variety of industries. (*Id.*)

In 1974 Bishop Tube was purchased by Christiana Metals Corporation ("Christiana"), an Italian corporation. (*Id.* at 13789.) Bishop Tube continued to operate in Frazer as a division of Christiana. (*Id.*)

The parties agreed at oral argument that between 1969 and 1979, both before and after Bishop Tube became a division of Christiana, Bishop Tube arranged for the transportation of hazardous materials from its Frazer facility to the Malvern Superfund Site. (Tr. at 3–4.) [3]

In 1980, Congress enacted CERCLA. Groundwater contamination associated with the Malvern Site was first identified in the spring of 1980 in residential wells. (Pl.'s Resp. Ex. 2 at 56412.) In September 1983, the Malvern Superfund Site was listed on the National Priorities List. (*Id.*)

### B. Electralloy's purchase of Bishop Tube

In 1988 or 1989, the CEO and President of Electralloy Corporation ("Electralloy") traveled to Italy to negotiate buying Bishop Tube from Christiana. (Pl.'s Resp. Ex. 7.) Christiana's lawyer during the negotiations in Italy was Giovanni Lega. (*Id.*) An appraisal of the Bishop Tube assets in 1988 indicated an "orderly liquidation value" of $2,476,000. (Pl.'s Resp. Ex. 8 at 4.) In 1989, Electralloy bought the Bishop Tube Company from Christiana and Bishop Tube became a division of Electralloy. (Pl.'s Resp. Ex. 7; Tr. at 4.) Although Electralloy bought the Bishop Tube Company and continued to operate the Bishop Tube facilities, Christiana retained ownership of the real estate, *i.e.* the land and the

mon Realty Corporation; Trenton Realty Corporation; Quaker City, Inc.; J & J Spill Services & Supplies, Inc.; Lightman Drum Co., Inc.; Resource Technology Services, Inc.; Marcegaglia USA, Inc.; Petrocon, Inc.; McClarin Plastics, Inc.; Ametek, Inc.; CSS International Corp.; Princo Instruments, Inc.; Emeco Industries, Inc.; David K. Robson, Inc.; Transicoil, Inc.; Horizon Aero-

space, L.L.C.; Hulltronics, Inc.; Kosempel Manufacturing Company; Keystone Environmental Services, Inc.; Philadelphia Steel Drum Co., Inc.; NW Controls, Inc.; and Resource Recovery Atlantic, Inc.

**3.** All citations to transcript pages refer to the transcript of the June 30, 2005 oral argument on the instant summary judgment motion.

buildings, and Electralloy leased the real estate from Christiana. (Pl.'s Resp. Ex. 10 at 1.)

### C. Electralloy's bankruptcy and Marcegaglia's purchase of the Bishop Tube assets

In January 1991, Electralloy filed a petition under Chapter 7 of the Bankruptcy Code. (Pl.'s Resp. Ex. 8 at 1.) At the same time that Electralloy filed for bankruptcy, it ceased operations at the Bishop Tube facility. (Woolard Dep. at 12–13.) The United States Bankruptcy Court appointed Richard W. Roeder as the trustee of Electralloy's bankruptcy estate. (Pl.'s Resp. Ex. 8 at 2.)

The trustee, with the approval of the bankruptcy court, scheduled an auction of the Bishop Tube assets, consisting of machinery, equipment and inventory located at the Bishop Tube facility, for September 24, 1991. (Id. at 4; Pl.'s Resp. Ex. 9.) The trustee represented to the bankruptcy court: "No appraisal of the Property has been made since 1988, which indicated an orderly liquidation value of Two Million Four Hundred Seventy Six Thousand Dollars ($2,476,000.00). However, the Trustee estimates that the value of the Property is closer to One Million Dollars ($1,000,-000.00)." (Pl.'s Resp. Ex. 8 at 4.) The sale of the Bishop Tube assets was to be "free and clear of all liens" and the bankruptcy trustee told that court that he believed "the highest net recovery to the estate will be obtained by selling the [Bishop Tube assets] at public auction." (Id. at 5.)

On September 23, 1991, the bankruptcy trustee canceled the auction. (Pl.'s Resp. Exs. 10 & 11.) The Bishop Tube assets

that were to be auctioned were instead conveyed back to Christiana in full satisfaction of Christiana's claims against Electralloy. (Id.) Christiana had a claim of nearly $5 million against Electralloy's bankruptcy estate. (Pl.'s Resp. Ex. 10 ¶ 5.) Between $3.5 million and $4 million of the claim was unsecured. (Id. ¶ 10.) The trustee also paid Christiana $296,000 as an "administrative expense." (Id. ¶ 9.) As part of the deal, Christiana received the "right, title and interest to the trade name and goodwill of Bishop." (Id. at Ex. A.)

Also on September 23, 1991, Christiana sold the assets of Bishop Tube to Marcegaglia S.p.A., the Italian parent company of defendant Marcegaglia, for $1.6 million in cash. (Pl.'s Resp. Ex. 14.) At the time of sale, Marcegaglia S.p.A. intended to "reoperate the plant as an ongoing concern for the production of tubes and pipings or to use the premises as a temporary warehouse for the machinery." (Pl.'s Resp. Ex. 18 at 1.) If Marcegaglia S.p.A. decided to operate the plant as an ongoing concern, it would be obliged to lease the premises from Christiana for at least three years.[4] (Id. at 1–2; Pl.'s Resp. Ex. 22.) The sale agreement between Christiana and Marcegaglia S.p.A. specified that Marcegaglia S.p.A. was not assuming and would not be liable for any liabilities of Bishop Tube. (Pl.'s Resp. Ex. 14 at 2.)

Christiana and Marcegaglia S.p.A. did not have any overlapping shareholders, directors or officers.

### D. Marcegaglia's operations

On January 1, 1992, the New Bishop Tube Company[5] was incorporated as a

---

**4.** If Marcegaglia S.p.A. decided not to operate the plant, it was obliged to remove the machinery from the premises within sixty days of its decision. (Pl.'s Resp. Ex. 18 at 2.) Marce-

gaglia had until December 31, 1991 to make its decision. (Id. at 1.)

**5.** The New Bishop Tube Company later changed its name to Damascus–Bishop Tube

subsidiary of Marcegaglia S.p.A. (Pl.'s Resp. Ex. 15.) The New Bishop Tube Company, using some employees from Italy, upgraded and modernized the Frazer facility. (Woolard Dep. at 36–37.) The New Bishop Tube Company re-opened the Frazer facility in the second half on 1992, approximately eighteen months after Electralloy ceased operations. (Woolard Dep. at 12–13, 36.)

When the New Bishop Tube Company was first incorporated, Steno Marcegaglia was president of the corporation. (Pl.'s Resp. Ex. 15.) At some point between the New Bishop Tube Company's incorporation and March 2, 1995, Giovannia Lega, who was Christiana's lawyer during its negotiations with Electralloy in Italy in 1988, became president of the company.[6] (Pl.'s Resp. Ex. 3 at 3, Ex. B.)

The New Bishop Tube Company hired three out of the eighty people who were employed at the Bishop Tube facility under Electralloy: Howard Long, the plant manager; Russ Levering, the plant engineer; and James Woolard, the sales manager. (Woolard Dep. at 14–18.) These were the only three employees of Electralloy that were retained by the court during the bankruptcy proceedings. (Id. at 17.) Howard Long left the New Bishop Tube Company before the Frazer facility re-opened.

The New Bishop Tube Company manufactured stainless steel pipe and tubing in sizes ranging from 0.75″ to 4.5″ in diameter. (Pl.'s Resp. Ex. 3 at 3.) When the New Bishop Tube Company first started operations, it only had a handful of customers. (Woolard Dep. at 41–43.) These customers were tubing distributors and had also been customers of Electralloy. (Id.)

In February 1993 the New Bishop Tube Company acquired the assets of Damascus Tubular Products and changed its name to the Damascus–Bishop Tube Company. (Marcegaglia Dep. at 13–14, 61–62.)

In November 1996, the United States Environmental Protection Agency ("EPA") notified the Damascus–Bishop Tube Company that it was a potentially responsible party in the cleanup of the Malvern Superfund Site. (Pl.'s Resp. Ex. 21.)

In 1999, Damascus–Bishop Tube Company changed its name to its current name, Marcegaglia USA, Inc. (Marcegaglia Dep. at 13–14.)

## III. STANDARD OF REVIEW

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is a "genuine" issue if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must make an initial showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant must then "make a showing sufficient to establish the existence of [every] element essential to that party's case,

---

Company which then changed its name to Marcegaglia USA, defendant in the instant case.

**6.** Neither party alleges or presents evidence on exactly when, between January 1, 1992

and March 5, 1995, Giovanni Lega became president of the New Bishop Tube Company or how long he remained president. (Tr. at 45.)

and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In determining whether the non-moving party has established each element of its case, the court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV. DISCUSSION

The parties agree that Bishop Tube, Christiana, and Electralloy are all liable under CERCLA, either directly or as a successor-in-interest. (Tr. at 3, 5.) Marcegaglia argues that Action Manufacturing fails to show that Marcegaglia, formerly the New Bishop Tube Company and the Damascus–Bishop Tube Company, is liable as a successor-in-interest to Bishop Tube. Action Manufacturing argues that the nature of Marcegaglia's purchase of the Bishop Tube assets made Marcegaglia liable under a theory of successor liability known as "substantial continuity."

*A. Viability of the substantial continuity test* [7]

*1. Law of successor liability under CERCLA*

■ In *Smith Land & Improvement Corp. v. Celotex Corp.*, decided in 1988, the Third Circuit held that successor corporations can be held liable under CERCLA and "that the general doctrine of corporate successor liability is appropriate in CERCLA contribution claims." 851 F.2d 86, 87 (3d Cir.1988). *Smith Land* also held that courts should follow federal common law in

resolving successor liability issues. *Id.* at 91 ("... Congress expected the courts to develop a federal common law to supplement the statute."). *See also Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 212 (3d Cir.1994) ("[M]ost courts have recognized that imposition of CERCLA liability on a successor corporation is a question of federal law.").

■ In determining the content of federal common law, the Third Circuit emphasized the need for national uniformity and the need to consider the general doctrine of successor liability in all states:

> In resolving the successor liability issues here, the district court *must consider national uniformity;* otherwise, CERCLA aims may be evaded easily by a responsible party's choice to arrange a merger or consolidation under the laws of particular states which unduly restricts successor liability. The general doctrine of successor liability in operation in most states should guide the court's decision rather than the excessively narrow statutes which might apply in only a few states.

851 F.2d at 92. *See also Beazer East*, 34 F.3d at 214 ("[I]f we refuse to apply *uniform federal standards* to regulate CERCLA liability, CERCLA aims may be evaded easily by a responsible party's choice to arrange a merger or consolidation under the laws of particular states which unduly restrict successor liability.") (emphasis added). Thus, under *Smith Land*, federal common law, which governs successor liability under CERCLA, consists of the general doctrine of successor liability in opera-

---

7. The parties assume that the substantial continuity test is applicable in the instant case and do not address the validity of this theory of successor liability in their briefs. I indicated in oral argument on the instant motion that I would likely adopt the substantial continuity test. However the Third Circuit has not specifically addressed whether the substantial continuity test, also known as the "continuity of enterprise" test, should be used to determine successor liability in CERCLA cases. After more thorough research, I am obliged to fully address this issue.

tion in most states. *See also Atchison, Topeka, and Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1997) ("creat[ing] federal common law rules of successor liability by drawing on the traditional rules of successor liability in operation in most states") (internal citations omitted).[8]

While *Smith Land* held in 1988 that courts must look to the uniform federal standards governing successor liability under CERCLA, the Supreme Court unanimously held in 1998 that courts should not create new CERCLA-specific federal law in determining the liability of corporations under CERCLA. *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). In *Bestfoods*, the Supreme Court affirmed the Sixth Circuit's ruling that a parent corporation could only be liable for the actions of its subsidiary under CERCLA if the common law rules for piercing the corporate veil were met. In doing so, the *Bestfoods* court indicated that it would respect the corporate structure and general rules of limited liability unless "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud...." *Id.* at 62, 118 S.Ct. 1876. While discussing the general principle that a parent corporation is not liable for the acts of its subsidiaries, the Court wrote "nothing in CERCLA purports to reject this bedrock principle and against this venerable common-law backdrop, the congres-

sional silence is audible." 524 U.S. at 62, 118 S.Ct. 1876. The Court rejected the expansion of already existing rules of corporate liability under CERLCA:

> CERCLA is thus like many another congressional enactment in giving no indication that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute ... and the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that in order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.

*Id.* at 63, 118 S.Ct. 1876 (internal quotation marks and citations omitted).[9]

Thus, the holdings of *Smith Land* and *Bestfoods* combined result in the following principles that guide my decision: federal common law governs successor liability in CERCLA cases; in the interest of national uniformity, federal common law consists of the traditional common law rules on successor liability in operation in most jurisdictions; and traditional common law rules on successor liability should not be expanded for CERCLA cases.

### 2. The traditional common law rules on successor liability

▇▇▇▇▇ The traditional common law rule on successor liability holds as a general

---

**8.** In creating federal common law, federal courts may chose to base federal law on existing state law rules. *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 595 n. 12, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973). Federal common law on successor liability in CERCLA cases is based on the existing general doctrine of successor liability in operation in most states.

**9.** The Court specifically declined to address whether it should apply state common law or federal common law on corporate veil-pierc-

ing in CERCLA cases. *Bestfoods*, 524 U.S. at 63 n. 9, 118 S.Ct. 1876. The Third Circuit directs me to apply federal common law in the case before me. *Smith Land*, 851 F.2d at 91. Federal common law on successor liability consists of the law that is applicable in most jurisdictions, which is the same as the "general doctrine of successor liability in operation in most states." *Id.* at 92. Thus, in the instant case, state common law and federal common law are the same.

rule that a purchaser of assets does not succeed to the seller's liabilities. *Philadelphia Elec. Co. (PECO) v. Hercules, Inc.*, 762 F.2d 303, 308 (3d Cir.1985); *Atchison, Topeka and Santa Fe Ry.*, 159 F.3d at 361. Four exceptions to this general rule of non-liability are "widely recognized[ ] in Pennsylvania and elsewhere": a purchaser of assets only succeeds to the seller's liabilities where (1) the purchaser of assets expressly or impliedly agrees to assume the obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; [10] (3) the purchasing corporation is a mere continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability. *PECO v. Hercules*, 762 F.2d at 308–09.

The rule that liabilities are not transferred through asset purchases except in one of the above four circumstances is the traditional common law rule recognized by jurisdictions across the nation. *See PECO v. Hercules*, 762 F.2d at 308–09 (describing this rule as "widely recognized[ ] in Pennsylvania and elsewhere"); *Atchison, Topeka and Santa Fe Ry.*, 159 F.3d at 361 (9th Cir.1997) (describing this as "the traditional rule[ ] of successor liability in operation in most states"); *New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682, 685 (2d Cir. 2003) (describing this as the "traditional common law rule"); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir.1992) (describing this as "the settled rule"); Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 (2004). Under *Smith Land*, federal common law consists of the general doctrine of successor liability in operation in most states and federal common law controls the issue of successor liability in CERCLA cases. Therefore, the traditional common law rule on successor liability set forth above controls in the instant case.

Action Manufacturing argues that Marcegaglia is liable as a successor to Bishop

---

**10.** Action Manufacturing also argued that Marcegaglia is liable as a successor under the *"de facto* merger" theory of successor liability. (Pl.'s Resp. at 12.) Under this theory, courts have found successor liability in the context of an asset purchase when the asset purchase was a *de facto* merger. *PECO v. Hercules*, 762 F.2d at 308. In order to determine that a particular transaction amounts to a *de facto* merger as distinguished from an ordinary purchase and sale of assets, a court looks to the following factors: (1) there is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations; (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation. *Id.* at 310.

Action Manufacturing is unable to show that Marcegaglia's purchase of the Bishop Tube assets was a *de facto* merger because two out of the four factors are missing. Regarding the second factor, Marcegaglia's purchase of the Bishop Tube assets was a cash purchase, with no exchange of stock and there are no common shareholders between Marcegaglia and Christiana or Electralloy. (Pl.'s Resp. Ex. 14.) Regarding the fourth factor, Marcegaglia did not assume any of the obligations of Christiana or Electralloy that would have been necessary for uninterrupted operation of the Bishop Tube facility. Indeed, the facility remained closed for 18 months. (Woolard Dep. at 12–13, 36.) Thus, factors two and four are not present in the transaction and Action Manufacturing is unable to show that the transaction amounted to a *de facto* merger. Action Manufacturing conceded such in oral argument on the instant motion. (Tr. at 37.)

Tube through Marcegaglia's purchase of the Bishop Tube assets. Yet Action Manufacturing does not meet any of the four traditional common law exceptions to the general rule that, as a purchaser of assets, Marcegaglia should not succeed to Bishop Tube's liabilities. Instead, Action Manufacturing argues that Marcegaglia should be liable as an asset purchaser under the theory of "substantial continuity."

*3. The substantial continuity test is an expansion of traditional common law rules*

The substantial continuity test is not part of the traditional doctrine of successor liability as set forth above. Rather, the substantial continuity test, also known as the "continuity of the enterprise test," is often described as an expansion of the traditional "mere continuation" theory of successor liability. *See, e.g., United States v. Mexico Feed and Seed Co., Inc.*, 980 F.2d 478, 487–88 (8th Cir.1992) (describing the substantial continuity test as a "broadened test of successorship ... which has evolved from the 'mere continuation' test in contexts where the public policy vindicated by recovery from the implicated assets is paramount to that supported by the traditional rules delimiting successor liability"); *United States v. Exide*, No.00-cv-3057, 2002 WL 319940, *3 (E.D.Pa. Feb. 27, 2002) (describing the substantial continuity test as a "theory of CERCLA successor liability ... that is more relaxed, and therefore easier to meet, than the 'mere continuation' exception under the traditional successor liability rules"). Under the traditional mere continuation theory, the purchasing corporation is liable as a "mere continuation" of the transferor corporation if, after the transfer of assets,

there is an identity of stock, stockholders, and directors between the two corporations. *Carolina Transformer*, 978 F.2d at 838; *Mexico Feed and Seed*, 980 F.2d at 487. The substantial continuity test expands the mere continuation doctrine by making a purchaser of assets liable if it is a "substantial continuation" of the seller corporation, even if there is no identity of stock and stockholders. *Mexico Feed and Seed Co.*, 980 F.2d at 487.

■ Under the substantial continuity test, the purchaser of assets is liable if an examination of the following eight factors indicates that the purchaser is a "substantial continuation" of the seller: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities and location; (4) production of the same products; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise. *Carolina Transformer*, 978 F.2d at 838; *Atlantic Richfield Co. v. Blosenski*, 847 F.Supp. 1261, 1287 (E.D.Pa.1994).[11]

As set forth above, under *Smith Land* and *Bestfoods*, I must apply federal common law, which consists of the traditional common law rules of successor liability in operation in most jurisdictions, without creating any new CERCLA-specific law. *Supra* section IV.A.1. The substantial continuity test is not part of the general doctrine of successor liability in operation in most states. Rather, it is an expansion of one of the traditional rules of successor liability. *Mexico Feed and Seed Co.*, 980 F.2d at 487. *Bestfoods* rejects the notion

**11.** Courts applying the substantial continuity test in the CERCLA context disagree on whether knowledge of potential CERCLA liability is a necessary component of the sub-stantial continuity test. *Compare United States v. Atlas Minerals & Chems., Inc.*, 824 F.Supp. 46, 50 (E.D.Pa.1993), *with Atlantic Richfield*, 847 F.Supp. at 1287.

of creating CERCLA-specific law that expands traditional common law rules on corporate liability. 524 U.S. at 63, 118 S.Ct. 1876 ("CERCLA ... giv[es] no indication that the entire corpus of state corporation law is to be replaced ..."). Therefore, I should not apply the substantial continuity test in the instant case.

A review of circuit court decisions from other circuits also indicates that the substantial continuity test is not part of federal common law and, in the interests of national uniformity, should not be applied in the case before me. *See Smith Land* 851 F.2d at 92 (requiring courts to apply federal common law and "consider national uniformity").

### 3. The national trend rejects the substantial continuity test in CERCLA cases

The Third Circuit has not specifically addressed whether the substantial continuity test should be used to determine successor liability in CERCLA cases. However, six other courts of appeals have addressed this issue. *New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003); *United States v. Davis*, 261 F.3d 1 (1st Cir.2001); *Atchison, Topeka and Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358 (9th Cir.1997); *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244 (6th Cir.1994); *United States v. Mexico Feed and Seed Co., Inc.*, 980 F.2d 478 (8th Cir.1992); *United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir. 1992).

Four out of the six circuit courts addressing this issue refused to apply the substantial continuity test under CERC-LA. The four courts refusing to apply the substantial continuity test are also the courts that rendered the most recent decisions. Only the Eighth and the Fourth Circuits, the two earliest decisions, endorse the substantial continuity test. An examination of these decisions reveal that the substantial continuity test is not part of the federal common law and should be rejected in the interests of a national uniform rule on successor liability.

The Second Circuit held in 2003 that the substantial continuity test was not part of federal common law and therefore was not a viable theory of successor liability in CERCLA cases. *Nat'l Serv. Indus.*, 352 F.3d at 686 (overturning *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir.1996)). In a prior decision rendered in 1996, the Second Circuit had departed from "general common law principles of corporate law" and, instead, adopted the substantial continuity test as a "special rule for use in CERCLA cases." *Nat'l Serv. Indus.*, 352 F.3d at 685–86 (citing *Betkoski*). However, two years later, in 1998, the Supreme Court in *Bestfoods* held that courts "must apply common law rules and not create CERCLA-specific rules." *Nat'l Serv. Indus.*, 352 F.3d at 685. After *Bestfoods*, the Second Circuit held that its prior endorsement of the substantial continuity test in *Betkoski* was "no longer good law." *Id.* The court then examined the traditional common law rule on successor liability, which notably did not include the substantial continuity doctrine.[12] The court also examined the current state of the substantial continuity doctrine, which is used in

---

**12.** The Second Circuit set forth the traditional common law rule on successor liability as follows, "[T]he traditional common law rule states that a corporation acquiring the assets of another corporation only takes on its liabilities if any of the following apply: the successor expressly or impliedly agrees to assume them; the transaction may be viewed as a de facto merger or consolidation; the successor is the 'mere continuation' of the predecessor; or the transaction is fraudulent." 352 F.3d at 687.

federal labor law [13] and in some products liability cases.[14] After these examinations, the court concluded:

> [T]he substantial continuity test is not a sufficiently well established part of the common law of corporate liability to satisfy *Bestfoods'* dictate that common law must govern. . . . We thus find that the substantial continuity doctrine is not a part of general federal common law, and following *Bestfoods*, should not be used to determine whether a corporation takes on CERCLA liability as the result of an asset purchase.

352 F.3d at 686–87.

Only a couple of years earlier, in 2001, the First Circuit also rejected the substantial continuity test in favor of Connecticut's "mere continuation" test. *Davis*, 261 F.3d at 53–54. The *Davis* court noted that those courts adopting the substantial continuation test in CERCLA cases cited to CERCLA's "broad remedial purpose" and the "importance of national uniformity." *Id.* at 53. The First Circuit rejected the reasoning of other courts adopting the substantial continuity test because the Supreme Court's *Bestfoods* decision:

> left little room for the creation of a federal rule of liability under [CERCLA]. . . . [T]o justify the creation of a federal rule, there must be a specific, concrete federal policy or interest that is compromised by the application of state law. . . . We see no evidence that the application of state law to the facts of this case would frustrate any federal objective.

*Davis*, 261 F.3d at 54. Therefore, the First Circuit refused to apply the substantial continuity test and instead applied the mere continuation test under Connecticut's law of successor liability. Although the First Circuit applied Connecticut law on

---

**13.** The fact that the substantial continuity test is well-established in the context of federal labor law does not indicate that it is extendable to other areas of federal common law. The Supreme Court has specifically held that section 301 of the Labor Management Relations Act "authorizes federal courts to fashion a body of federal law for the enforcement of [] collective bargaining agreements." *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Nat'l Serv. Indus.*, 352 F.3d at 686. With this authorization, courts expanded "the perimeters of the labor-law doctrine of successorship" beyond the general rules governing asset purchases. *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). However, unlike the Labor Management Relations Act, CERCLA does not permit the creation of a new body of successor liability law to replace the common law already in existence. *Bestfoods*, 524 U.S. at 63, 118 S.Ct. 1876. Thus, the use of the substantial continuity test in the context of federal labor law does not indicate that the substantial continuity test has become a part of federal common law or that it can be used to determine successor liability in the context of CERCLA cases.

**14.** At present, a handful of courts have applied the substantial continuity doctrine in products liability cases. *Nat'l Serv. Indus.*, 352 F.3d at 686 (citing *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir.1985)); *Mexico Feed and Seed*, 980 F.2d at 488; *see also* Fletcher, *Cyclopedia of the Law of Private Corporations* § 4892.75 ("A few states have loosened the traditional 'mere continuation' exception to focus on continuity of the business or enterprise . . . [but][m]ost courts that have considered the continuation of enterprise exception have refused to adopt it.").

The Third Circuit specifically declined to adopt the substantial continuity theory of successor liability in products liability cases. *Polius v. Clark Equip. Co.*, 802 F.2d 75 (3d Cir. 1986) ("We conclude that this continuity of enterprise theory, adopted by a minority of jurisdictions, is an unsound exception to the general rule of corporate successor liability."). The use of the substantial continuity test in products liability cases by a minority of jurisdictions does not render the test part of the federal common law nor part of the "general doctrine of successor liability in operation in most states."

successor liability and the Second Circuit applied federal common law, both courts refused to apply the substantial continuity test in CERCLA cases.

The Ninth Circuit in 1998 also held that the substantial continuity test was not a viable theory of successor liability in CERCLA cases. *Atchison, Topeka and Santa Fe Ry.*, 159 F.3d at 364.[15] The Ninth Circuit found that California state law did not recognize the substantial continuation doctrine. *Id.* The court also held that federal common law rules of successor liability consisted of the traditional rules in operation in most states, which included the mere continuation doctrine but not the substantial continuation doctrine. *Id.* at 361. Thus, neither state law nor federal common law permitted the substantial continuity test. The Ninth Circuit refused to create new federal common law by extending the mere continuation doctrine to encompass the substantial continuity test. *Id.* at 364. Rather, the court noted that "the traditional rules of successor liability in operation in most states should determine the limits of CERCLA liability." *Id.* (internal quotations omitted). Although the Ninth Circuit did not mention the Supreme Court's *Bestfoods* decision, the Ninth Circuit's reasoning is entirely consistent with *Bestfoods'* holding that courts should not create new federal law in determining corporate liability in CERCLA cases.

The Sixth Circuit in 1996 also held that the substantial continuity test, referred to as the continuity of enterprise test, could not be used in CERCLA cases. *City Mgmt. Corp.*, 43 F.3d at 253. The Sixth Circuit held that liability of a successor corporation for CERCLA obligations is determined by reference to state corporation law. 43 F.3d at 250. Although the Michi-

gan Supreme Court expanded the traditional mere continuation rule to include cases where there is a "continuity of the enterprise" in a products liability case, according to the Sixth Circuit, the reasoning and language of the state court's opinion indicated that the expanded exception is limited to products liability cases and was inapplicable in determining successor liability under CERCLA. *Id.* at 252–53.

Thus, from 1996 to 2003, the Sixth, Ninth, First, and Second Circuits all found that the substantial continuity test was not a valid theory of successor liability in CERCLA cases. Although these cases might have differed in their reasoning on whether they were applying state law or federal law, this difference is insignificant under the Third Circuit's decision in *Smith Land*. *Smith Land* requires that I apply federal common law, which consists of the general doctrine of successor liability in operation in most states. 851 F.2d at 91–92. In making this holding, the *Smith Land* court emphasized the need for national uniformity. *Id.* at 92. The decisions of the Sixth, Ninth, First, and Second Circuits indicate that the majority of circuit courts addressing this issue have rejected the substantial continuity test; that the substantial continuity test is not a part of the general doctrine of successor liability in operation in most jurisdictions and therefore is not part of federal common law; and that concerns for national uniformity require that the substantial continuity test not be applied in the instant case.

Only two circuit courts, the Fourth and the Eighth Circuits, have endorsed the substantial continuity test. *U.S. v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir.1992); *Mexico Feed and Seed*, 980

---

15. The court declined to decide whether state law or federal common law dictated the pa-rameters of successor liability under CERCLA. 159 F.3d at 364.

F.2d 478 (8th Cir.1992). Both courts rendered their decisions in 1992, well before the Supreme Court's admonition in *Bestfoods* that courts should not create CERCLA-specific law on corporate liability. *Bestfoods,* 524 U.S. at 63, 118 S.Ct. 1876. Although the Fourth and Eighth Circuits indicated that the substantial continuity test was a valid theory of successor liability, a closer look at both cases indicates that both courts were mostly concerned with preventing fraud and preventing responsible parties from evading CERCLA liability simply through the structure of subsequent transactions.

In *Carolina Transformer,* the Fourth Circuit found that "the record as a whole leaves the unmistakable impression that the transfer of the Carolina Transformer business [the seller] to FayTranCo [the purchaser] was part of an effort to continue the business in all material respects yet avoid the environmental liability arising from the PCB contamination at the [Carolina Transformer] site." 978 F.2d at 841. The facts in the Fourth Circuit case indicated that the seller corporation was the owner and operator of the contaminated site; that the EPA and the North Carolina State Division of Environmental Management were investigating the contaminated cite both before and during the time of the asset transfer; that the owner of the selling corporation sold the assets to a company owned and operated by his children; that some of the transferred assets were later resold at significantly higher prices; and that the owner of the selling corporation played an active part in running the purchaser corporation, his children's company. *Id.* 835–840.

The Fourth Circuit found that, with this set of facts, the purchaser corporation would not be liable as a successor to the seller corporation under the traditional mere continuation rule of successor liability because there was no overlap of stock ownership between the two companies. *Carolina Transformer,* 978 F.2d at 838. Therefore, the Fourth Circuit applied the substantial continuity test and found the purchaser liable as a successor to the seller. *Id.* at 840–41.[16] Although the Fourth Circuit looked at the eight factors of the substantial continuity test in reaching its decision, the Fourth Circuit seemed mostly concerned with the facts in the case indicating that the seller and purchaser corporations were engaging in the asset transfer for the purpose of evading environmental liability. *Id.* at 841 ("the record as a whole leaves the unmistakable impression that the transfer of the [assets] . . . was part of an effort to continue the business in all material respects yet avoid the environmental liability arising from the . . . contamination at the site").

Similarly, the Eighth Circuit, in endorsing the substantial continuity test, indicated that its main concern was preventing responsible parties from evading liability through asset transfers. The Eighth Circuit wrote that an asset purchaser's "knowledge of pending wrongs unremedied made broadening the net of liability fair." *Mexico Feed and Seed,* 980 F.2d at 488. The court noted that in the CERCLA context, "cases imposing 'substantial continuation' successorship have correctly focused on preventing those responsible for the wastes from evading liability through the structure of subsequent transactions." *Id.* In the Eighth Circuit case, the court found that the purchasing entity had no notice of

---

**16.** The Fourth Circuit considered the factors of the substantial continuity test and found that the seller and the purchaser corporations had the same employees, management personnel, customers, products, and that the purchaser held itself out as a continuation of the seller. *Carolina Transformer,* 978 F.2d at 839–40.

potential CERCLA liability. *Id.* at 489. The court also noted that the asset purchase was not

> a cozy deal where responsible parties merely changed the form of ownership yet in substance stayed the same, nor one where the actual managers of a corporation took over its ownership with full knowledge of its past practices. Nor is this a case where a purchasing corporation either in collusion with the seller, or independently, bought only "clean" assets, and knowingly left "dirty" assets behind with an insufficient asset pool to cover any potential liability. Nor is this a case of willful blindness.

*Id.* at 489. Even though the Eighth Circuit endorsed the substantial continuity test as a valid test of successor liability in CERCLA cases, the court concluded that there was no successor liability in the case before it partly, if not mostly, because there was no indication of fraud or of any purposeful evasion of environmental liability. *Id.* at 489–90.

The Fourth and Eighth Circuits both considered knowledge or notice in their application of the substantial continuity test. This renders the substantial continuity test comparable to the traditional common law doctrine that allows successor liability through transactions fraudulently entered into to escape liability. *See Carolina Transformer,* 978 F.2d at 838, 841; *Mexico Feed and Seed,* 980 F.2d at 488. As noted by the Ninth Circuit:

> [A]ltering the traditional "mere continuation" exception to encompass the broader "substantial continuation" exception adds little in the end. In the cases in which the broader exception has been applied to hold an asset purchaser liable, there had usually been some fraudulent intent and collusion present, in which case the purchaser would have likely already been liable under another

traditional exception—the fraudulently-entered transaction exception.

*Atchison, Topeka and Santa Fe Ry.,* 159 F.3d at 364 (citing *Carolina Transformer*).

In sum, the decisions of the Fourth and Eighth Circuits endorsing the substantial continuity test should not control in the case before me because they represent the minority view of the circuit courts and every circuit court to address this issue since the Fourth and Eighth Circuits' decisions in 1998 has rejected the substantial continuity test. Additionally, the Fourth and Eighth Circuits' decisions have been undermined by the Supreme Court's decision in *Bestfoods* which instructs courts not to expand traditional common law rules on corporate liability in CERCLA cases. Finally, the substantial continuity test that the Fourth and Eighth Circuits actually applied seems to duplicate a traditional common law theory of successor liability that is already in existence—that of the fraudulently-entered transaction.

This review of circuit court decisions indicates that the majority view, and the national trend, is to reject the substantial continuity test. Given *Smith Land'*s concerns with national uniformity and given that courts in the Third Circuit must apply federal common law which consists of the general doctrine of successor liability applicable in most states, I follow the majority of circuit courts that have addressed this issue and conclude that the substantial continuity test should not be applied to determine successor liability in CERCLA cases.

I recognize that other courts in this district have applied the substantial continuity test in cases of CERCLA liability. *See Commonwealth of Pennsylvania Dept. of Envtl. Prot. v. Concept Sciences, Inc.,* 232 F.Supp.2d 454 (E.D.Pa.2002) (Baylson, J.); *United States v. Exide,* 2002 WL

319940 (E.D.Pa. Feb.27, 2002) (Buckwalter, J.); *Elf Atochem North America v. United States,* 908 F.Supp. 275 (E.D.Pa. 1995) (Joyner, J.); *Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261 (E.D.Pa. 1994) (Giles, J.); [17] *United States v. Atlas Minerals and Chem., Inc.,* 824 F.Supp. 46 (E.D.Pa.1993) (Cahn, C.J.). Most of these cases are undermined because they were decided prior to the Supreme Court's decision in *Bestfoods,* decided in 1998, and prior to the Second, First, and Ninth Circuits' decisions refusing to apply the substantial continuity test in CERCLA cases.

Only two cases, *Exide* and *Concept Sciences,* from this district were decided after *Bestfoods.* The *Exide* court, which rendered its decision in 2002, specifically declined to resolve "whether federal common law properly includes the 'substantial continuity test.'" Instead, the court found the purchaser corporation liable as a successor under both the substantial continuity test and the traditional *de facto* merger doctrine. 2002 WL 319940, *5. Because the *de facto* merger doctrine is not applicable in the present case, *supra* n. 9, I must reach the question that the *Exide* court did not reach, and I conclude that the substantial continuity test is not a part of federal common law and should not be applied to determine successor liability in CERCLA cases.

As for *Concept Sciences,* also decided in 2002, the court did not appear to consider the holding of *Bestfoods* or the circuit courts addressing this issue. 232 F.Supp.2d at 457–58. Rather, in its denial of a motion to dismiss, the court noted that the Third Circuit had not yet addressed the validity of the substantial continuity test in CERCLA cases and chose to follow the holding of other courts in this district.

*Id.* at 457. I respectfully disagree and choose to follow the majority view of other circuit courts.

I return to the principles set forth by *Smith Land* and *Bestfoods* that control my decision: federal common law governs successor liability in CERCLA cases; in the interest of national uniformity, federal common law consists of the traditional common law rules on successor liability in operation in most jurisdictions; and traditional common law rules on successor liability should not be expanded for CERCLA cases. I may only apply the substantial continuity test if it is a part of federal common law. As set forth above, the substantial continuity test is not part of federal common law because it is not part of the general doctrine on successor liability in operation in most states. Nor should I attempt to expand federal common law beyond traditional common law rules in order to encompass the substantial continuity test. Therefore, the substantial continuity test should not be applied in the case before me.

Action Manufacturing does not show successor liability under any of the traditional exceptions to the general rule of non-liability through asset purchases. Therefore, Marcegaglia's motion for summary judgment is granted.

### B. Application of the Substantial Continuity Test

Even if the substantial continuity test were applicable to determine successor liability under CERCLA, Action Manufacturing's claims against Marcegaglia would be dismissed because Action Manufacturing

---

**17.** The Honorable James T. Giles is currently Chief Judge of the Eastern District of Pennsylvania.

fails to show that Marcegaglia is a substantial continuation of Bishop Tube.

### 1. Factors to be considered

■ As stated above, under the substantial continuity test, the purchaser of assets is liable as a successor-in-interest to the seller of the assets if an examination of the following eight factors indicates that the purchaser is a "substantial continuation" of the seller: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities and location; (4) production of the same products; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise. *Carolina Transformer*, 978 F.2d at 838; *Atlantic Richfield Co. v. Blosenski*, 847 F.Supp. 1261, 1287 (E.D.Pa.1994) (Giles, J.). The parties agree that these eight factors are part of the substantial continuity test. (Def.'s Mot. at 9; Pl.'s Resp. at 15.)

■ However, the parties do not agree on whether a court must find that the purchaser corporation had knowledge of potential CERCLA liability before applying the substantial continuity test. (Def.'s Mot. at 8–9; Pl.'s Resp. at 21.) Courts applying the substantial continuity test in the CERCLA context disagree on whether knowledge of potential CERCLA liability is a necessary component of the substantial continuity test. *Compare United States v. Atlas Minerals & Chems., Inc.*, 824 F.Supp. 46, 50 (E.D.Pa.1993) (Cahn, J.), *with Atlantic Richfield*, 847 F.Supp. at 1287.

In *United States v. Atlas Minerals & Chems., Inc.*, 824 F.Supp. 46 (E.D.Pa.1993) (Cahn, J.), the court held that the substantial continuity test should only supplant the traditional rules of successor liability when the purchasing corporation has actual knowledge or notice of potential CERCLA liability or when there were "substantial ties" between the purchaser and the seller corporations. 824 F.Supp. at 51. "Substantial ties" consist of evidence that the asset purchase was less than an arms-length transaction between competitors, that it was a "cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same," or that the purchasing corporation knowingly bought only the "clean assets" and left the "dirty assets" behind. 824 F.Supp. at 50–51. Similarly, in *Elf Atochem North America v. United States*, 908 F.Supp. 275 (E.D.Pa.1995) (Joyner, J.), the court wrote:

> If mere purchase and subsequent use of assets always gave rise to successor liability, no company could ever purchase another company's machines and plant, retain the people who were already trained to use those machines, manufacture and sell to that product's market without becoming liable for all the obligations of the selling company....
>
> Accordingly, successor liability has generally only been found when there are substantial ties between purchaser and seller such as a cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same or when the actual managers of a corporation took over its ownership with full knowledge of its past practices. This is in contrast to arm's-length transactions between competitors. When a purchaser has no knowledge of potential CERCLA liability, successor liability is rarely found.

908 F.Supp. at 282–83 (internal quotation marks and citations omitted).

Other courts disfavor a scienter requirement in the substantial continuity test. In *Atlantic Richfield*, the court stated its belief that limiting the substantial continuity

test to cases where the purchaser had knowledge of potential CERCLA liability was improper given that CERCLA liability applies even in the absence of a causal link between the CERCLA defendant and the environmental harm.[18]  847 F.Supp. at 1287. Likewise, in *United States v. Exide*, the court held that knowledge of potential liability is not necessary in order to apply the substantial continuity test.  2002 WL 319940, *11 (E.D.Pa. Feb.27, 2002) (Buckwalter, J.).  The *Exide* court wrote, "the purpose of applying the continuity of enterprise theory is to support the goals of CERCLA and to hold responsible parties liable, not to hold only those who knew of the potential problems liable." *Id.* (internal citations and quotations omitted).

However, most courts, including those that reject requiring knowledge of potential liability, consider the presence of knowledge or "substantial ties" to be among the numerous factors considered under the substantial continuity test.  The *Atlantic Richfield* court, in finding substantial continuity, found that the purchaser in that case had actual knowledge of CERCLA liability.  847 F.Supp. at 1287. Indeed, the purchase agreement in *Atlantic Richfield* stated that the seller's site had been placed on the National Priorities List by the EPA and that the owners of the site had received a "Letter of Responsibility" with respect to the site.  *Id.* In *Carolina Transformer*, in which the Fourth Circuit found successor liability based on substantial continuity, there was enough evidence of substantial ties be-

tween the purchaser and seller that the court wrote, "the record as a whole leaves the unmistakable impression that the transfer ... was part of an effort to continue the business in all material respects yet avoid the environmental liability." 978 F.2d at 841.  In finding that a purchaser was not a substantial continuation of the seller, the Eighth Circuit in *Mexico Seed and Feed* found that the purchaser "had no actual notice.  It had no knowledge of the offending tanks nor had [the seller] been identified as a potentially responsible party for CERCLA purposes."  980 F.2d at 489.

Thus, the case law shows that although knowledge is not a requisite factor under the substantial continuity test, evidence of knowledge or "substantial ties" is certainly one of the many factors, and perhaps one of the more important factors, to be considered by a court in determining whether the purchaser corporation is a substantial continuation of the seller.[19]

### 2. The substantial continuity test as applied in this district

I am only aware of, and Action Manufacturing only cites, two cases within the Eastern District of Pennsylvania that have found successor liability on the basis of the substantial continuity test.[20]  *See Atlantic Richfield Co. v. Blosenski*, 847 F.Supp. 1261 (E.D.Pa.1994) (Giles, J.); *United States v. Exide*, 2002 WL 319940 (E.D.Pa. Feb.27, 2002) (Buckwalter, J.).

---

**18.** The *Atlantic Richfield* court did not actually hold that knowledge was not a requisite factor in the substantial continuity test because the court found that the purchaser had actual knowledge of potential CERCLA liability.  847 F.Supp. at 1287.

**19.** Knowledge, or "substantial ties" from which knowledge can be inferred, is part and parcel of the traditional successor liability

doctrine of fraud.  When considering this factor, the court is basically looking for something that is not "kosher."

**20.** In one of these cases, *Exide*, the court also found that the purchaser of assets was liable as a successor because the asset purchase was a *de facto* merger, one of the traditional doctrines of successor liability.  2002 WL 319940, *5.

In *Atlantic Richfield*, the court found that every factor of the substantial continuity test, including actual knowledge of potential CERCLA liability, was present. 847 F.Supp. at 1287, 1289–92. In that case, Eastern Waste Industries, Inc. ("EWI") bought the assets of the waste hauling business of Blosenski Disposal Company, the Blosenski Trucking Corporation and the Suburban Sanitation Corporation (collectively "Blosenski"). *Id.* at 1283. EWI offered employment to all of Blosenski's employees, including management personnel. *Id.* at 1289–90. EWI maintained the same employee salaries, benefits and seniority. *Id.* Blosenski's "product" was the provision of trash or waste hauling service. *Id.* EWI assumed Blosenski's customer contracts and provided the same service to the same customers in an uninterrupted fashion. *Id.* EWI used the same assets that Blosenski used, including Blosenski's trucks and waste containers. *Id.* EWI also continued to use Blosenski's name and held itself out as a continuation of Blosenski. *Id.* at 1291. EWI sent invoices bearing Blosenski's name to its customers, and EWI's contracts and advertisements also used the Blosenski name. *Id.* At the time of the asset purchase, EWI was also aware that Joseph and Ada Blosenski had received a "Letter of Responsibility" from the EPA. *Id.* at 1287. The *Atlantic Richfield* court concluded on the basis of these facts that EWI was a substantial continuation of Blosenski. *Id.* at 1292.

The court also found substantial continuity in *Exide*. 2002 WL 319940. In *Exide*, General Battery Corporation ("General") bought the assets of Price Battery Corporation ("Price"). *Id.* at *1. While there is no evidence in *Exide* that General had any notice of Price's potential CERCLA liability, the *Exide* court found every other factor of the substantial continuity test. 2002 WL 319940. General purchased all of Price's assets and assumed all of Price's rights under its existing contracts, "including contracts pertaining to employment and employee benefits, insurance, customers, purchasing, [and] material supply...." *Id.* at *1. The court found a "significant continuity of management and almost total continuity of other personnel." *Id.* at *6. General continued operating in the same location as Price and continued to use variations of the Price name. *Id.* at *7–8. The court also found that "General continued servicing Price's customers in an uninterrupted fashion." *Id.* at *9. The *Exide* court found that General was a substantial continuation of Price on the basis of these facts. *Id.* at *11.

With these examples of substantial continuity in mind, I turn to the facts at hand.

### 3. Substantial continuity factors in the instant case

██ Some of the factors of the substantial continuity test are present in the case before me while others are completely absent. I examine each of the factors in turn.

#### a. Retention of the same general personnel

It is undisputed that Marcegaglia did not retain the same general employees as Bishop Tube in that seventy-eight out of the eighty employees who worked at the Bishop Tube facility under Electralloy never worked at the facility under Marcegaglia. (Tr. at 61.) Thus, this factor of the substantial continuity test is completely absent in the instant case.

#### b. Retention of the same supervisory personnel

Marcegaglia, under the name the New Bishop Tube Company, hired three supervisory personnel who had also worked at

the Bishop Tube facility under Electralloy: Howard Long, the plant manager; Russ Levering, the plant engineer; and James Woolard, the sales manager. (Woolard Dep. at 14–18.) These were the only three employees of Electralloy that were retained by the court during bankruptcy proceedings. (*Id.* at 17.) Howard Long left the New Bishop Tube Company before it started operations at the facility. The parties do not present evidence as to how many other supervisory personnel worked in the Bishop Tube facility under Electralloy or under Marcegaglia.

### c. Retention of the same production facilities and location / Continuity of assets

The parties agree that Marcegaglia operated in the same facilities and location as Bishop Tube and continued to use the Bishop Tube assets. Marcegaglia upgraded and modernized the Bishop Tube facilities and assets before it started operations. (Woolard Dep. at 36–37.)

### d. Production of the same products

Marcegaglia and Bishop Tube produced very similar products. Bishop Tube manufactured metal alloy tubing in sizes ranging from 0.125″ to 2″ in diameter. (Pl.'s Resp. Ex. 5 at 13783.) These tubes were used in a variety of industries. (*Id.*) The New Bishop Tube Company manufactured stainless steel pipe and tubing in sizes ranging from 0.75″ to 4.5″ in diameter. (Pl.'s Resp. Ex. 3 at 3.)

### e. Retention of the same name / Holding itself out as a continuation of the previous enterprise

Marcegaglia was incorporated as the New Bishop Tube Company in January 1992. (Pl.'s Resp. Ex. 15.) It changed its name to Damascus–Bishop Tube Company in February 1993. (Marcegaglia Dep. at 13–14, 61–62.) Marcegaglia adopted its current name in 1999. (Id. at 13–14.) The fact that Marcegaglia adopted a modified version of the Bishop Tube name is some evidence that it held itself out as a continuation of the previous enterprise.

### f. Continuity of general business operations

Marcegaglia did not continue the general business operations of Bishop Tube in that the Bishop Tube facility remained closed and inoperative for eighteen months between the time Electralloy declared bankruptcy and the time Marcegaglia started operations there. (Woolard Dep. at 12–13, 36.) Thus, service to any former Bishop Tube customers ceased when Electralloy declared bankruptcy.

### g. Knowledge or "substantial ties"

Action Manufacturing concedes that it does not have any evidence that Marcegaglia had actual knowledge or notice of any potential CERCLA liability. (Tr. at 41.) However, Action Manufacturing argues that the timing of the asset purchase, the purchase price, and the repeat appearance of Giovanni Lega indicate the presence of "substantial ties" between the Marcegaglia and Christiana. (Pl.'s Resp. at 21.) Action Manufacturing argues that the virtually simultaneous transfer of the Bishop Tube assets from Electralloy to Christiana to Marcegaglia, on the eve of a public auction of the Bishop Tube assets, is evidence that the asset purchase was less than an arms-length transaction. Action Manufacturing also argues that Marcegaglia's purchase price of $1.6 million in 1991 was suspiciously low given that the orderly liquidation value of the assets in 1988 were reported to be $2.5 million. However, the bankruptcy trustee in 1991 estimated that the value of the assets were closer to $1 million. Finally, Action Manufacturing

points out that Giovanni Lega, who represented Christiana in Italy during its 1988 negotiations with Electralloy, was president of Marcegaglia at some point before 1995 but after Marcegaglia's incorporation as the New Bishop Tube Company in 1992.

Action Manufacturing's evidence fails to show the presence of "substantial ties" between Marcegaglia and Christiana. Other courts describe substantial ties as " 'a cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same' or when 'the actual managers of a corporation took over its ownership with full knowledge of its past practices.' " *Elf Atochem*, 908 F.Supp. at 282–83 (quoting the Eighth Circuit's decision in *Mexico Feed and Seed*, 980 F.2d at 489–90). In the Fourth Circuit case *Carolina Transformer*, there was evidence of substantial ties because the owner of the seller corporation sold the assets of his corporation to a company owned by his children. 978 F.2d at 835. After the asset sale, the father played an active role in running his children's company. *Id.* at 839–40. Additionally, there was evidence in *Carolina Transformer* that some of the assets purchased were subsequently resold for a substantially higher price. *Id.* at 839. The extent of "substantial ties" described in *Elf Atochem* and *Mexico Feed and Seed* and present in *Carolina Transformer* is significantly more than that presented by Action Manufacturing in the instant case. Therefore, Action Manufacturing fails to show the substantial ties factor of the substantial continuity test in the instant case.

### 4. These factors are insufficient to show substantial continuity

A comparison of the above facts to the facts present in other cases in which courts have found substantial continuity, such as *Atlantic Richfield* and *Exide*,[21] further indicates that the facts in this case are insufficient to show that Marcegaglia is a substantial continuation of Bishop Tube. Action Manufacturing is able to show that some of factors of the substantial continuity test are present in the instant case: Marcegaglia did indeed retain some of the same supervisory personnel as Bishop Tube; Marcegaglia retained the same production facilities and location; Marcegaglia continued to use the same assets as Bishop Tube, albeit with some upgrades and modernizations; Marcegaglia produced a very similar product as Bishop Tube; and Marcegaglia continued to use a form of the Bishop Tube name.

However, other significant factors of the substantial continuity test are not present in the case before me. First, there is absolutely no continuation of general employees between Marcegaglia and Bishop Tube. On the contrary, in *Atlantic Richfield*, the purchaser corporation not only retained all of the seller's general employees, the purchaser corporation maintained the same employee salaries, benefits, and seniority. 847 F.Supp. at 1289–90. Likewise, in *Exide*, the court found "almost total continuity of other [non-management] personnel," and the purchaser continued all contracts including contracts pertaining to employment and employee benefits. 2002 WL 319940, *1, 6. The fact that Marcegaglia did not retain the same general employees as Bishop Tube weighs strongly against a finding of substantial continuity.

Second, Marcegaglia did not continue the general business operations of Bishop Tube. Indeed, the Bishop Tube facility was inoperative for a period of eighteen months. (Woolard Dep. 12–13, 36.) On the

---

**21.** *Atlantic Richfield* and *Exide* are the only cases in the Eastern District of Pennsylvania that have found successor liability through the substantial continuity test.

contrary, in *Atlantic Richfield* the purchaser continued the seller's waste hauling service in an uninterrupted fashion. 847 F.Supp. at 1289–90. The purchaser assumed the seller's customer contracts and continued to service the same service routes without any major changes. *Id.* The *Exide* court also found that the purchaser "continued servicing Price's [the seller's] customers in an uninterrupted fashion." 2002 WL 319940, *9. The fact that the Bishop Tube facilities remained closed and inoperative for eighteen months, while the purchasers in *Atlantic Richfield* and *Exide* assumed the contracts of the sellers and continued business without any interruption, is also a significant factor against finding substantial continuity.

Finally, there is no evidence that Marcegaglia had actual knowledge or notice of potential CERCLA liability and, contrary to Action Manufacturing's argument, there is no evidence of "substantial ties" between Marcegaglia and Bishop Tube. *Supra* section IV.B.3.g. In contrast, when the *Atlantic Richfield* court found substantial continuity, it found that the purchaser had actual knowledge of potential CERCLA liability. Indeed, the written purchase agreement in *Atlantic Richfield* states that the seller's site had been placed on the National Priorities List by the EPA and that the owners of the site had received a "Letter of Responsibility" with respect to the site. 847 F.Supp. at 1287.

In sum, the facts in the instant case do not indicate that Marcegaglia was a substantial continuation of Bishop Tube. There was no continuity of general employees between Marcegaglia and Bishop Tube, Marcegaglia did not continue the general business operations of Bishop Tube, and Marcegaglia had no actual knowledge of potential CERCLA liability or any "substantial ties" with Bishop Tube.

The facts leading to a finding of substantial continuity in *Atlantic Richfield* and *Exide* were far greater than the facts presented here. In *Atlantic Richfield*, the court found that each and every factor of the substantial continuity test had been met, including actual knowledge of potential CERCLA liability, a continuity of general employees, and an uninterrupted continuation of general business operations. 847 F.Supp. at 1287, 1289–90. In *Exide*, while there was no evidence that the purchaser had any knowledge of the seller's potential CERCLA liability, the court found that every other factor of the substantial continuity test had been met, including a continuity of general employees and an uninterrupted continuation of business operations. 2002 WL 319940, *10–12.

In light of the examples of *Atlantic Richfield* and *Exide,* the only two courts in this district to find substantial continuity under CERCLA, the evidence in the case before me fails to show that Marcegaglia is a substantial continuity of Bishop Tube.

## V. CONCLUSION

For the reasons stated above, the substantial continuity test is not a valid theory of successor liability under CERCLA. However, even if the substantial continuity test were applied in the instant case, the facts fail to show that defendant Marcegaglia is a substantial continuation of defendant Bishop Tube. Therefore, Marcegaglia's motion for summary judgment is granted.

## ORDER

AND NOW, this 31st day of August 2005, it is **ORDERED** that defendant Marcegaglia USA's motion for summary judgment (doc. # 356) is **GRANTED.** All

claims against defendant Marcegaglia are **DISMISSED.**